**SAVE OUR CUMBERLAND MOUNTAINS, INC., et al., Plaintiffs,**

v.

**Donald P. HODEL, et al., Defendants.**

**Civ. A. No. 81–2134.**

United States District Court, District of Columbia.

Dec. 23, 1986.

Brent N. Rushforth, Jim McElfish, Dow, Lohnes & Albertson, L. Thomas Galloway, Galloway & Greenberg, and Katherine P. Ransel, Nancy Crisman, Advocates for the Public Interest, Washington, D.C., for plaintiffs.

Alfred T. Ghiorzi, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

The Surface Mining Control and Reclamation Act of 1977 ("Surface Mining Act" or "Act"), 30 U.S.C. §§ 1201–1328, is a comprehensive statute designed, *inter alia*, to control and remedy adverse social, economic and environmental effects of surface coal mining operations, to minimize damages and risks affecting productivity of the soil arising from such operations, to protect the health and safety of the public, and to prevent or mitigate adverse effects of present and future surface coal mining operations. The Secretary, Department of the Interior ("Secretary") is primarily responsible for administering and implementing the Act and is obligated to take enforcement action against strip mining operators who have violated provisions of the Act.

In September 1981, counsel for two Appalachian environmental groups, Save Our Cumberland Mountains, Inc. and Council of Southern Mountains, joined forces and filed this citizens' suit against the Secretary of Interior and the Director of the Office of Surface Mining ("OSM") of the Interior Department. They sought to enjoin those officials from further failing to recognize and to perform their statutory enforcement duties under the Surface Mining Act.

At an early stage of the litigation the plaintiffs were granted summary judgment relief and on December 28, 1982, defendants were directed to assess mandatory, statutory, civil penalties against surface mine operators who had been previously cited for violations and issued cease and desist orders, but who nonetheless had never been fined and subject to the final relief prescribed under the Surface Mining Act. The Secretary was also ordered to pursue mandatory enforcement action against operators who ignored failure-to-abate, and cease and desist orders as required under relevant regulations. *Save Our Cumberland Mountains, Inc. v. Watt,* 550 F.Supp. 979 (D.D.C.1982). Meanwhile, Congress specifically appropriated $1.1 million to implement this Court's 1982 ruling and on November 4, 1983, President Reagan signed into law H.R. 3069, the Department of Interior and Related Agencies Appropriations Act for 1984, Pub.L. No. 98–146, 97 Stat. 919 (Nov. 4, 1983).

The government successfully appealed the December 1982 summary judgment decision, and on January 20, 1984, this Court's ruling was reversed on procedural grounds. *Save Our Cumberland Mountains, Inc. v. Clark,* 725 F.2d 1434 (D.C. Cir.1984). The Circuit Court held that venue did not lie in the District of Columbia to review the Interior Secretary's failure to seek enforcement of the Act. Thereafter, the plaintiffs sought a rehearing *en banc.* On April 2, 1984, the rehearing petition was granted and the Circuit Court's opinion and judgment were vacated.

Following these developments, the parties to this litigation pursued negotiations which resulted in a settlement, the provisions of which were embodied in an amended order entered by this Court on January 31, 1985. That order expressly provided that plaintiffs could apply for an award of attorneys' fees and costs for legal services undertaken and completed through January 31, 1985.

Section 520 of the Surface Mining Act, 30 U.S.C. § 1270, expressly recognizes citizen suits and provides in part that persons having an interest which is adversely affected may commence a civil proceeding to compel compliance with the Act and authorizes the Court to award costs and attorneys' fees. Plaintiffs rely on this provision to request an award of attorneys' fees and costs totaling $463,497 as the prevailing party in this major litigation. Defendants concede, as they must, to plaintiffs' entitlement to fees and costs. However, they contest plaintiffs' petition arguing that the amount claimed is excessive, reflects unnecessary monitoring efforts by attorneys, inflated hourly rates and improper and undeserved application of multipliers.

After considering the factual submissions and representations of counsel and their legal memoranda, the Court determines that the sum of $383,273.00 in fees

and $9,697.19 in costs is a fair and reasonable amount.

## DISCUSSION

The Court's determination of a reasonable fee award follows the market value methodology approved recently by the Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The determination of an appropriate award begins with the calculation of a "lodestar" —the number of hours reasonably expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). And as Justice Powell noted—"[T]his calculation provides an objective basis by which to judge the value of a lawyer's services." *Id.* at 433, 103 S.Ct. at 1939. In certain circumstances, the court may then adjust the "lodestar" upward or downward through the use of multipliers if merited. *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548.

### A. Hours Reasonably Expended

 The starting point of a "lodestar" analysis is a determination of the number of hours reasonably expended by the attorneys for the prevailing parties in the litigation. Billing judgment is an important element of the fee request. Excessive or unproductive time must be subtracted from the calculation. *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*). Where the petitioner has omitted unproductive time from its request, the application should identify the nature of the work and the number of hours involved. *National Association of Concerned Veterans v. Secretary of Defense ("NACV")*, 675 F.2d 1319, 1327–28 (D.C.Cir.1982). Petitioning attorneys must document the number of hours claimed with sufficient detail to permit both the court and opposing counsel to conduct an informed appraisal of the merits of the application. *Id.* at 1323.

In this action, plaintiffs have requested compensation for a total of 2,508.20 hours claimed by attorneys and a total of 644.45 hours claimed by paralegals. Their request includes demands for work performed on the following discrete segments of this litigation:

Category 1 —Proceedings on the merits before the District Court

Category 2 —Appellate proceedings and petition for *en banc* rehearing

Category 3 —Settlement negotiations

Category 4 —Monitoring of 1982 order and 1985 amended order

Category 5 —Fee Petitions before this Court in 1983 and 1985

Plaintiffs have proffered extensive documentation, including a day-by-day breakdown of the time spent by every attorney on each segment of the case and a description of the hours that were excluded from the fee request in the exercise of billing judgment. The government contends, however, that the total number of claimed hours must be reduced further because of what it identifies as substantial blocks of nonproductive time.

The Court is reluctant to engage in a detailed line-by-line analysis of the fee petition and the voluminous file in this case to determine, like a quasi-management consultant, if plaintiffs' counsel could have accomplished particular tasks or pleadings more efficiently. *See Copeland*, 641 F.2d at 903. As the Supreme Court succinctly stated "A request for attorneys' fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. The extensive time records and affidavits submitted demonstrate that plaintiffs' counsel actually spent the time they claim. Therefore, to avoid a second round of litigation which threatens to surpass the litigation on the merits of this matter, the Court will follow the procedure suggested by Circuit Judge Edward Tamm in his concurrence in *NACV*, and consider the "issues" raised by the government's opposition to the hours claimed for each of the five categories in order to determine if reductions or more detailed scrutiny of the time records are appropriate. *NACV*, 675 F.2d at 1338.

### Category 1

 Plaintiffs request compensation for a total of 359.80 hours expended by their attorneys during the initial stages of this

litigation, primarily for the work of Attorneys L. Thomas Galloway, Brent Rushforth, and James McElfish. A small amount of time is claimed by Attorney Lee Bishop. The government challenges specifically only 38.6 of the expended hours as unreasonable, arguing that particular pleadings should have taken less time to prepare. Their principal objection is to the 26 hours claimed for drafting the complaint which the government claims could have been done in one-half the time charged. On its face, however, the hours expended in preparing and drafting the complaint are neither unreasonable nor excessive. The same can be said of the hours claimed for other tasks undertaken in the early stages of this litigation, including preparation for oral argument.

■ The government also raises a general challenge to the time the attorneys devoted to reviewing each other's work and consulting or conferring with one another. It cannot be denied that such conferences are essential and result in effective and efficient litigation. As related to Category 1, the amount of time spent on these activities was not excessive by any standard. All hours claimed by plaintiffs' counsel for this category are allowed.

### Category 2

A total of 443.55 hours is claimed for work done by six attorneys on the application for rehearing before the panel appeal and the petition for rehearing *en banc.* This claim already excludes a total of nearly one-third or 112.80 hours which were eliminated in the exercise of billing judgment. The government challenges the amount of time spent on these tasks and resists the payment of any fee to the public interest group, Advocates for the Public Interest ("Advocates"). It also argues that no compensation should be allowed for the initial appeal before the Circuit Court because plaintiffs were denied relief on their application.

■ The last argument can be rejected out of hand. The principle that fees cannot be awarded for work done on fractionable, unsuccessful claims is applicable to petitions under statutes, such as 42 U.S.C. § 1988, that grant fees to the "prevailing party." *See Hensley,* 461 U.S. at 424, 103 S.Ct. at 1935. However, this action was not brought under a statute which limits the granting of fees to prevailing parties nor does it involve a party who was only partially successful on the merits. The government's reliance on *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), as support for their argument is inapposite. The *Ruckelshaus* court held that attorneys' fees may not be awarded to a party *completely* unsuccessful in legal action pursued under 42 U.S.C. § 7607(f). But it does not even remotely suggest that compensation must be denied for portions of the litigation on which plaintiffs failed to prevail and, in fact, holds just the opposite. As the Court stated: "Section 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties, to *partially prevailing* parties—parties achieving *some success,* even if not a major success." [1] 463 U.S. at 688, 103 S.Ct. at 3279 (emphasis in original). Plaintiffs here, in the end, achieved not only "some" success, but a "major" success. After the petition for rehearing *en banc* was granted, the government settled the case and readily agreed to the relief initially sought by the plaintiffs. The fact that no liability was admitted and that the earlier judgment of this Court was not reinstated and the original opinion and judgment of the Circuit Court was vacated, is irrelevant. The government should bear the expense of the entire appeals proceedings. It could have avoided costly and time consuming litigation at an early date, by recognizing at the outset its clear responsibility and duty under the Act. It chose, however, to pursue another course of action.[2]

1. Section 307(f) of the Clean Air Act, 42 U.S.C. § 7607(f), in language almost identical to 30 U.S.C. § 1270(d), allows the court to award reasonable attorneys' fees "whenever it determines that such award is appropriate."

2. It is worth noting that Judge Charles Richey of this Court, in a case involving the same parties and statute but different substantive issues, upheld the government's venue argument and dismissed the case. *Save Our Cumberland Moun-*

■ Defendant's argument that Advocates should be denied fees altogether because its work was unnecessary is unconvincing. Given the risk of failing altogether on appeal and therefore collecting no fee at all, it was more than reasonable for original counsel to seek to spread the risk among other groups. Ms. Nancy Crisman, the lead attorney from Advocates involved in this litigation, had significant experience in regulatory litigation, and otherwise, was an excellent and fortunate choice to assist original counsel. She was the primary author of the successful petition for rehearing *en banc.* The Court notes that in the exercise of billing judgment, Advocates' claim for time spent working on the appeal was reduced by approximately 25 percent. Among the time eliminated was that spent by its attorneys familiarizing themselves with the history of the case and the applicable law. The detailed time records submitted by Advocates comply fully with the requirements for documentation as provided in the case law of this Circuit and otherwise permit an independent determination that the time claimed was reasonably expended.

The government also challenges the total amount of time expended by plaintiffs' lawyers in Category 2. It claims that one of the government's junior attorneys spent only 225 hours during this stage in contrast to the plaintiffs' claim of 443.25. And it argues that the work on the appeal and the petition for rehearing duplicated efforts made in another case, *Save Our Cumberland Mountains, Inc. v. Clark ("two-acre case"),* 725 F.2d 1422 (D.C.Cir.1984), *see supra* note 2.

As the government itself stated in opposing plaintiffs' discovery request for the time records of government attorneys: "In short, the time Government attorneys devoted to the appeal of this case has no bearing on the number of reasonable hours devoted to an appeal by plaintiffs' counsel." Memorandum in Opposition to Motion to Compel, Aug. 23, 1985, at 3. The question is whether the hours actually expended by the plaintiffs' attorneys were reasonably expended.[3]

Judge Richey's response to the claim that the similarities between the two-acre case and this case warranted a reduction in the hours that should be compensated for the appeals is timely and worthy of repetition:

> These suits were brought and prosecuted separately. Each case presented unique issues unto itself which required separate research, briefing and presentation before the Court of Appeals, which in turn issued separate decisions. There was no suggestion at any prior stage of these actions that they be consolidated for any purpose whatsoever. Thus, two separate petitions for re-hearing were required. Not even after the Court of Appeals granted the petition in this case for rehearing was it thought necessary by any party or by the Appeals Court to consolidate.

*Save Our Cumberland Mountains v. Hodel,* 622 F.Supp. 1160, 1164 (1985). Furthermore, counsel for plaintiffs indicate that they coordinated their efforts with counsel on the other case so as to avoid duplicating research on the venue issue.

---

*tains v. Hodel,* 622 F.Supp. 1160 (1985). The case then followed a course on appeal to that of this proceeding, and a settlement was reached there as well. Under the government's reasoning described above, Judge Richey should have awarded virtually no attorneys' fees because the plaintiff's *only* success came on the *en banc* petition. Such a result would be nonsensical, not to mention a subversion of congressional intent.

3. Contrary to the implication of the government's argument, four attorneys reviewed the appellate brief after it was drafted by the junior attorney. Still another attorney handled the oral argument. *See* Defendants' Response to Interrogatories and Request for Production, July 9, 1985, at ¶ 1. The government's careless, if unintentional, assertion in its opposition that only one attorney had worked on the appeal triggered unnecessary and wasteful discovery, culminating in various motions that had to be decided by a United States Magistrate. Plaintiffs have not asked for compensation for this additional work on the fee petition.

The government's citation to the hours permitted for work on appellate briefs in other cases is of little assistance in the task of determining a reasonable expenditure of time on the appeal in this proceeding. Legal issues vary widely in their degree of complexity and importance. Given the importance and difficulty of *this* case, and the significant, well documented exercise of billing judgment by counsel, the Court finds that the time claimed by plaintiffs here is fair, reasonable, and should be recognized.

### Category 3

After plaintiffs' petition for rehearing *en banc* was granted, extensive and protracted settlement negotiations ensued, all resulting in the January 31, 1985 amended order. Plaintiffs' counsel request compensation for a total of 349.65 hours covering this phase. The vast majority of these hours were expended by Mr. Galloway, who conducted almost all of the direct face-to-face negotiations with government lawyers from the Departments of Interior and Justice.

■ The government challenges all of the hours claimed during this period by the Advocates firm and hours spent by Mr. Galloway and two other attorneys consulting with Advocates attorneys. Again, the government argues that it was unnecessary to use these additional attorneys, asserting: "Their role can only be considered secondary, and their claim for an award for participation in settlement should be rejected *in toto*." Defendants' Memorandum in Opposition, May 24, 1985, at 29.

This challenge is baseless. First, no case support or persuasive reasoning is given for the proposition that work which is "secondary" should be ignored *"in toto."* But more specifically, the relatively small number of hours, approximately 43, spent by the Advocates materially assisted Mr. Galloway in his full time effort to resolve the case. Simply because the attorneys of that public interest firm were not in personal contact with government representatives does not mean their work was unproductive or superfluous. Background research,

drafting of proposals, and review of counter proposals were all activities with which Mr. Galloway needed assistance and for which compensation is appropriate. Similarly, the hours spent by these attorneys conferring with one another was not excessive and will be compensated.

### Category 4

■ Plaintiffs' lawyers spent nearly 1000 hours over a two-year period, between January 1983 and January 1985, monitoring the government's compliance with the Court's original relief order and, after settlement, the amended January 1985 order. Hours reasonably expended in this type of activity are compensable under section 520(d) of the Act. *See Delaware Valley,* 106 S.Ct. at 3095. In their April 1, 1985 application, plaintiffs provided a well-reasoned and carefully documented explanation of the type of work involved in ensuring that the Court's orders were carried out. Plaintiffs' Application for the Award of Fees and Expenses, Apr. 1, 1985, at 29–45; *cf. Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 368 (D.D.C.1983), *aff'd in part and rev'd in part on other grds.,* 746 F.2d 4 (D.C.Cir.1984). In *Laffey,* a lengthy affidavit outlining the history of the litigation was useful in assessing the fee request, even though the trial judge had first hand knowledge of most of counsel's work. Since this Court had little involvement in the monitoring of the 1982 order and the settlement, a detailed summary such as the one supplied in this proceeding by plaintiffs, is even more essential to a determination of whether hours not resulting in pleadings or other filed documents were reasonably expended. Without this explanation, it would be extremely difficult to award fees for such a large expenditure of time.[4]

Most of the monitoring work was carried out by Mr. Galloway, an acknowledged expert on mining practices and requirements of the Act. His time records for the monitoring period set out with specificity the activities in which he engaged. He affirms that the time spent reflects the exercise of

---

**4.** Plaintiffs also request compensation for over 400 hours of paralegal time during this period.

billing judgment and that unproductive or unnecessary time has been eliminated.

The monitoring effort in the first year after the 1982 relief order led to a number of disputes over proper development of and plaintiffs' access to Department of Interior computer records, the appropriate action to be taken in situations involving imminent danger to public health or the environment, and whether the Department would implement a permit denial system as part of alternative enforcement action required by the relief order. Throughout the early stages of monitoring, plaintiffs effectively challenged the adequacy of defendants' enforcement efforts and made invaluable contributions to the meaningful implementation of the Court's injunction.

In the later stages of the proceeding, particularly during the period immediately after the appeal panel's decision, plaintiffs spent less time on the monitoring activities. In the three months after settlement was reached, however, they increased their monitoring efforts. Again, a major area of dispute developed over access to defendants' documents and records in order to effectively monitor compliance with the settlement.

The opposition of the government to the claim for monitoring activities is, to be blunt, absurd. There could not be a more textbook example of "broad based, ill-aimed attacks ... in the nature of a blunderbuss." *NACV*, 675 F.2d at 1338 (Tamm, J., concurring). The government asserts that the time claimed covers "every telephone call or letter for information, clarification, etc. to anyone at Interior," Defendants' Memorandum in Opposition at 26, that the monitoring should have been limited to a periodic review of a sample of enforcement actions, and that the time spent because of disputes over access to vital computer information amounts to "[c]riticism about OSM's recordkeeping and/or housekeeping procedures" and should not be compensated. *Id.* at 27.

Based on one and one half pages of vague criticism, the government suggests that an award of $3,353.25, or two percent of plaintiffs' request, is an appropriate fee award for this category of work. This response is deficient on its face and even more outrageous considering the numerous congressional statements of intense concern over defendants' lack of compliance with this Court's 1982 order. *E.g.*, House Comm. on Government Operations, *Breakdowns in the Department of the Interior's Civil Penalty Assessment and Collections Program Have Adversely Affected the Enforcement of the Surface Mining Control and Reclamation Act of 1977*, H.R.Rep. No. 1146, 98th Cong., 2d Sess. (1984). For the government to suggest that the plaintiffs' monitoring efforts were excessive when compliance was so clearly lacking is ludicrous. No further comment is necessary. The claimed hours will be allowed in full.

**Category 5**

 Hours reasonably expended on preparation of fee petitions are also compensable. *Laffey*, 746 F.2d at 29; *Environmental Defense Fund, Inc. v. EPA*, 672 F.2d 42, 62–63 (D.C.Cir.1982). In this proceeding, two petitions were filed, the first in March 1983 after the December 1982 relief order, and the second in April 1985 after the final settlement of this case. Two reply briefs were also filed in response to the government's oppositions to each petition.

 The claim of 97.05 hours for the first petition, will be allowed in full. It results from a significant exercise in billing judgment on the part of original counsel. The second application causes the Court some concern. A total of 237.2 attorney hours are claimed,[5] along with 73.2 hours for an Advocates law clerk. The Court agrees that this amount of time is excessive, although the drastic reduction called for by the government is unwarranted.

---

5. Mathematical or typographical errors appear to have caused a discrepancy in the claim for Thomas Galloway's work on this application. Working from his time summary, Plaintffs' Application, Attachment 2, Exhibit FF, and noting plaintiffs' intention to reduce the hours he expended by 40 in the exercise of billing judgment, *see* Plaintiffs' Application at 47 n. *, the Court calculates Galloway's claim at 39 hours. Thus the total claim of 237.20.

The second request was not merely an update of the first. It was necessary to take account of developments in the law as to attorneys' fees and to carefully specify the work performed since the first petition, such as the settlement negotiations and monitoring activities, with which the Court was not yet familiar. As noted above, the summary of the monitoring activity, prepared primarily by Mr. Galloway, has been of great assistance. It is apparent, however, that in contrast to other portions of its application, Advocates has not exercised billing judgment to reduce the time claimed for work on the second fee petition. Therefore, the Court will reduce Ms. Crisman's and Mr. Preston's claims on the second fee petition by twenty-five percent, to account for duplication of research effort on subjects already explored to some extent in the earlier petition.

Full compensation will be allowed for the hours claimed by all attorneys who worked on the reply briefs filed in this case. The government brought these claims upon itself by its intransigent and niggardly approach to opposing the petitions.

**Compensation for Law Clerks and Paralegals**

The government would deny compensation for any time claimed for work undertaken and completed by paralegals or law clerks. They press this point even though all private firms involved, bill such time to paying clients. The argument is plainly contrary to the law of this Circuit. *Thompson v. Barrett,* 599 F.Supp. 806, 817 (D.D.C.1984); *Laffey,* 572 F.Supp. at 382. Particularly in the area of monitoring, the extensive use of paralegals by Mr. Galloway was cost effective and justified.

**B. Reasonable Hourly Rates**

Plaintiffs request compensation at their attorneys' current hourly rates in order to compensate for a delay in payment. Until the Supreme Court's recent decision in *Library of Congress v. Shaw,* —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), this request was consistent with accepted practice in this Circuit. *See, e.g., Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C.Cir. 1984). In *Shaw,* however, the Court held

that a fee award that included a multiplier for delay in payment violated the federal government's traditional immunity from interest assessments. It concluded that whether the multiplier was characterized as interest or compensation for delay was irrelevant:

> Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money.... Thus, whether the loss to be compensated by an increase in a fee award stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule.

*Id.* 106 S.Ct. at 2965 (citations and footnote omitted).

This language strongly suggests that the use of current rates also runs afoul of the no-interest rule. Pending further guidance from appellate authority, the Court will award fees based on the rates applicable at the time the services were provided, the so-called "historical rates." Although their various mathematical calculations utilize current rates, plaintiffs' extensive documentation in support of their fee request includes all the necessary information to allow a computation of the appropriate historical rates for the work done in this case.

A "reasonable hourly rate is that prevailing in the community for similar work." *Copeland,* 641 F.2d at 892; *accord Blum,* 465 U.S. at 895–96 & n. 11, 104 S.Ct. at 1547–48 & n. 11. If an attorney is involved in private practice the hourly rate charged for his or her services is presumptively a reasonable rate. *See Laffey,* 746 F.2d at 16–17. To encourage settlement and avoid turning every petition into a complicated ratemaking proceeding, this Circuit has held that *"[i]n almost every case, the firms' established billing rates will provide fair compensation."* *Id.* at 24 (emphasis in original). As a check on this general rule, the *Laffey* decision suggests that the reviewing court " 'bracket' this rate by establishing that it falls within the rates charged by other firms for similar work in the same community.... *So long as the firm's own rate falls within the*

*rate brackets, it is the market rate* for purposes of calculating the lodestar." *Id.* at 24–25 (emphasis in original). Adjustments should be made only in exceptional circumstances and are best accomplished by adjusting the lodestar during the subjective phase of the fee setting procedure. *Id.* at 25.

■■■ Where an attorney or a law firm has no established rate, a court must determine the prevailing market rate. "[R]ates charged in private representations may afford relevant comparisons." *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. The burden is on the applicant to establish that the requested rate is the prevailing community rate through affidavits and references to fee awards in similar cases. Once such a showing has been made, the government bears the burden to present evidence that the rate is erroneous. *See NACV,* 675 F.2d at 1325–26.

Plaintiffs' attorneys fall into three groups. The first includes those lawyers who were employed by private, for-profit law firms. Brent Rushforth and James McElfish were employed by Dow, Lohnes & Albertson. The second group of attorneys work for public interest firms and therefore do not normally collect a fee from their clients. Nancy Crisman, Katherine Ransel, Stephen Preston, and Lawrence Goldberg worked at Advocates for the Public Interest, formerly Center for Law in the Public Interest. Finally, a third group of attorneys work for private firms with a public interest law practice. Thomas Galloway and Eldon Greenberg operate their own firm handling health and safety and environmental issues for citizen groups, environmental and conservation organizations, miners and workers at mines, and widows of mine disasters. Mr. Bishop initially worked on the case for Harmon & Weiss, another private-public interest law firm.

### 1. Issues Raised by the Government

The government raises several arguments against the plaintiffs' fee schedule. First, it contends that plaintiffs' counsel should be compensated at different rates depending on the type of legal work they performed. *Copeland* did indeed suggest that legal research might warrant a lower rate than court appearances. 641 F.2d at 892. The more recent *Laffey* decision, however, clearly instructs the lower courts that a firm's own billing practices are given great weight in setting reasonable rates. None of the firms involved here differentiate in their billing rates between different categories of activities, and, indeed, such a differentiation is extremely rare in the legal community. As a matter of judicial administration, moreover, defendants' proposed course is burdensome. *Cf. Laffey,* 746 F.2d at 15. The Court is not prepared to assess the relative worth of legal activities, when the market provides no guidance.

Second, the government argues that plaintiffs involved an excessive number of experienced attorneys who commanded high billing rates which caused an inflated lodestar. Defendants suggest that the case could have been handled by a single lead attorney and one associate.

This argument is altogether lacking in merit. First, the government has exaggerated the supposedly top heavy staffing of the case. A number of undoubtedly very experienced and qualified attorneys represented the plaintiffs, but their activities, and therefore the hours they claim, were directed to different aspects of the litigation. Mr. Rushford was primarily responsible for district court litigation, Mr. Galloway's main expenditure of time came on settlement and monitoring. Ms. Crisman's work mainly concerned the appeals and the present fee petition. In addition, Ms. Ransel and Mr. Bishop, also characterized by the government as seeking partnership rates, were "junior" partners in terms of experience and will be compensated as such. In addition, as already noted, it was eminently reasonable for plaintiffs' counsel to spread the risk of loss in this hotly contested case among a number of firms.

Finally, the government argues that the rates requested by plaintiffs' counsel exceed the market rate in this area. However, its scanty selection of "evidence" sim-

ply is not as convincing as the well-marshalled, organized, and detailed supporting materials offered by the plaintiffs. The government has failed to demonstrate that plaintiffs' proposed rates are erroneous, and therefore, if consistent with the standards of this Circuit, those rates will be allowed.[6] *See NACV*, 675 F.2d at 1326.

## 2. Rates Allowed in This Case

### Private Attorneys

The Declaration of Brent Rushforth indicates the rates charged by Dow, Lohnes & Albertson for his services and those of James McElfish during the years covered by the fee request.[7] The rates are presumptively reasonable, falling well within the rates charged by private law firms in this city, as demonstrated by numerous supporting affidavits and exhibits. They are also in line with the rate schedule approved by the trial court in *Laffey* as market rates for litigating attorneys with varying amounts of experience. 572 F.Supp. at 371. The Court approves these rates as within the bracket of reasonable rates for similar work in Washington, D.C.

| Attorney | Year | Rate |
|----------|------|------|
| Rushforth | 9/81 – 2/83 | $125 |
| | 3/83 – 2/84 | $140 |
| | 3/84 – 8/84 | $150 |
| | 9/84 – 11/84 | $160 |
| | 12/84 – 1985 | $200 |
| McElfish | 9/81 – 1/83 | $ 70 |
| | 2/83 – 8/83 | $ 80 |
| | 9/84 – 11/84 | $ 90 |
| | 12/84 – 1985 | $110 |

### Public Interest Attorneys

To establish the hourly rates for the public interest attorneys involved in this litigation, plaintiffs have supplied affidavits from respected lawyers in this area and referred the Court to fee awards in other recently decided cases and to the schedule of rates approved by the trial court in *Laffey*. Plaintiffs also rely on a published survey of the billing rates of Washington law firms as of March 1983.

These materials provide a solid evidentiary basis for the determination of the appropriate rates for attorneys Crisman, Ransel, Goldberg, Preston, and Fitzgerald. The Court notes that Ms. Crisman and Ms. Ransel are experienced litigators and Ms. Crisman, particularly, has considerable experience and expertise in the regulatory field, having served as the Department of Energy's Assistant General Counsel for Regulatory Litigation from 1979–1983. Therefore, it cannot plausibly be argued that their rates should be reduced because they were performing services outside of their specialties. *Cf. Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir.1983) (relied on by defendants). Mr. Goldberg, Mr. Preston and Mr. Fitzgerald are young lawyers without developed specialties. They will be compensated at rates comparable to those of lawyers recently graduated from law school.

The rates requested in the present application for the public interest attorneys are designated as "current" rates. They are based, however, primarily on the *Laffey* rate schedule which took account of the market for legal services in Washington, D.C. in 1982 and 1983. Since Advocates became involved in the case in 1983, the government is not prejudiced by the use of these rates as a guideline, *Shaw* notwithstanding. Consequently the rates requested by the public interest attorneys in plaintiffs' application will be used, with one exception. For work performed in 1983, Ms. Ransel will receive $100, the *Laffey* rate based on her legal experience at that time. The rates allowed are as follows:

| Attorney | Year | Rate |
|----------|------|------|
| Crisman | 1983 | $150 |
| | 1984 | $150 |
| | 1985 | $150 |

**6.** The Court notes that after presenting evidence supposedly establishing market rates to be applied in this case, the government proposes compensating plaintiffs' attorneys at a blanket rate of $100 per hour, without regard to experience. This is perhaps one approach that could be taken to simplify rate setting, but it is not an approach that has been approved in this Circuit.

Indeed, the government's method of setting an actual figure for a reasonable fee in this case, *see* Defendant's Opposition at 46–47, is entirely arbitrary, lacking support in caselaw or common sense.

**7.** Plaintiffs' Application, Attachment 3, ¶¶ 6, 8.

| Attorney | Year | Rate |
|----------|------|------|
| Ransel | 1983 | $100 |
| | 1984 | $125 |
| | 1985 | $125 |
| Goldberg | 1983 | $ 75 |
| | 1984 | $ 75 |
| | 1985 | $ 75 |
| Preston | 1985 | $ 75 |
| Bishop | 1985 | $125 |
| Fitzgerald | 1983 | $ 75 |

### "Private," Public Interest Attorneys

The most difficult question relates to the rate that should be used to compensate those attorneys who have public interest practices but do bill some clients. A similar question was the primary issue before the Court of Appeals in *Laffey*, 746 F.2d 4. There, the law firm of Bredhoff & Kaiser sought payment at prevailing market rates, even though it charged its fee paying clients, mainly unions, a reduced rate. The question, according to the Court of Appeals, was primarily one of judicial administration, rather than lower versus higher rates. *Id.* at 15. As noted above, the court ruled that in almost every case, a firm's established billing rate is the "reasonable" rate to be allowed.

The three attorneys whose rates are still to be set, Mr. Galloway, Mr. Greenberg, and Mr. Bishop, all were involved in a practice for which they from time to time received fees from certain clients. Mr. Galloway and Mr. Greenberg charged $50–$60 per hour from 1981–1983 to national environmental and conservation groups able to afford some fee. In 1985, they were able to charge those organizations $75–$100 per hour. Mr. Bishop's rate, when he was associated with Harmon & Weiss, was $55–$60 per hour to non-commercial clients and $90 per hour to commercial clients.

The Court believes that the services of Mr. Galloway are not fairly compensated by reference to the rate he charges his occasional paying clients. His rates neither comport with reasonable rates charged for similar work in the community nor are they "established" as used by the court in *Laffey*. When the counsel's billing rate is outside the reasonable rate "bracket" for similar work in the community, *Laffey* suggests that an appropriate course would be to apply a multiplier to Mr. Galloway's lodestar, calculated using the low hourly rate. Clearly Mr. Galloway's rates are well below the market rate charged by his contemporaries in experience and expertise. Mr. Galloway graduated from law school in 1972. At the outset of this litigation, he had nine years of legal experience, by the time of settlement 13 years. More important, he has become a leading national expert, not only in mining law, but in the very statute that is the subject of this suit. He has testified on innumerable occasions before congressional committees and has been lead counsel for citizens and environmental groups on over a dozen major federal court cases since 1977 involving surface mining and coal related issues. In short, his billing rate is not within the bracket of appropriate rates for attorneys of his experience and expertise. In fact, it is near the average rate for beginning associates in 1984. *Around the Nation: Rates in 13 Cities*, Nat'l L.J., Feb. 27, 1984, at 30.

Although *Laffey* authorizes adjusting compensation by using a multiplier, the Court is more comfortable compensating Mr. Galloway according to the reasonable market billing rates. Use of the market rate conforms more closely to the Supreme Court's recent decisions in *Blum* and *Delaware Valley* which encourage reliance upon the more objective features of a market methodology. *See also*, Dobbs, *Awarding Attorney Fees Against Adversaries*, 1986 Duke L.J. 435, 468 (1986). *Laffey* involved counsel which had an established fee structure which enabled the court to hold a firm's *established* billing rate is presumptively reasonable. Bredhoff & Kaiser is described in *Laffey* as "following the same billing practices as an ordinary private law firm, and employing the same firm structure as a private law firm." *Laffey*, 746 F.2d at 14 n. 69. Mr. Galloway, in contrast, runs a two man firm, and does not have a rate schedule. His rate, when he charges one at all, varies based on his client's ability to pay. His is not an "established" rate within the meaning of *Laffey*.

Since Mr. Galloway has no "established" rate, it is more appropriate to award the prevailing market rate awarded to the other attorneys involved in this proceeding. This approach is consistent with our Circuit's decision in *Sierra Club v. Gorsuch*, 684 F.2d 972 (D.C.Cir.1982) (per curiam), *rev'd on other grounds sub nom. Ruckelshaus v. Sierra Club*, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (awarding prevailing market rate to private attorney who represented primarily public interest organizational clients); *see Laffey*, 746 F.2d at 14 n. 69. It also coincides with Judge Richey's determination of Mr. Galloway's reasonable hourly rate in the companion case. *Save Our Cumberland Mountains v. Hodel*, 622 F.Supp. 1160 (1985).

The Court has already set an appropriate rate for Ms. Crisman, an attorney who graduated from law school in the same year as Mr. Galloway. By awarding the same prevailing market rate to Mr. Galloway, the Court will achieve some consistency and fairness and avoid the additional subjective determination of an appropriate enhancement to his individual lodestar.[8] Mr. Galloway, however, will be awarded $115 per hour for work in 1981 and $125 per hour in 1982 to more accurately reflect a historical rate.

The same reasoning applies to Mr. Greenberg, a 1969 law school graduate, who, it should be noted, billed his time at $155 per hour in 1982 when in private practice. The small amount of time he claims in this proceeding came in 1983. A $150 per hour rate will be used for that time.

Mr. Bishop's work on this case while at Harmon & Weiss came in 1981–1983. His award will be based upon his normal rate to commercial clients during that period since it is well within the bracket of acceptable rates for an attorney of his experience. A slight reduction of his rate for

1981 will be made to reflect historical rates. Thus, the rates allowed for the remaining attorneys are:

| Attorney | Year | Rate |
| --- | --- | --- |
| Galloway | 1981 | $115 |
| | 1982 | $125 |
| | 1983 | $150 |
| | 1984 | $150 |
| | 1985 | $150 |
| Greenberg | 1983 | $150 |
| Bishop | 1981 | $ 85 |
| | 1982 | $ 90 |
| | 1983 | $ 90 |

## 3. Consideration of a Multiplier

Plaintiffs seek to augment the lodestar determination by applying two independent multipliers. First, they seek a five percent enhancement based on the exceptional risk they faced when commencing this litigation that they would receive no compensation. Second, they seek a ten percent enhancement based on the remarkable impact this case has had on achieving enforcement of the Act. Defendants object to plaintiffs' request arguing that the plaintiffs' success was not exceptional and the legal issues were neither novel nor complex.

The lodestar figure normally provides fully compensatory fees to prevailing plaintiffs. *Delaware Valley*, 106 S.Ct. at 3098, *Murray*, 741 F.2d at 1428. But only last term, the Supreme Court in *Delaware Valley*, reaffirmed its position that enhanced awards to the lodestar figure may be justified in exceptional cases. *See* 106 S.Ct. at 3098. Since the lodestar is presumptively adequate, plaintiffs bear a heavy burden of proving they deserve an upward adjustment. *Blum*, 465 U.S. at 888, 900, 104 S.Ct. at 1548, 1549. To meet this burden, they must present specific support that an adjustment is necessary to arrive at a final determination of a reasonable fee. Concurrent with this burden, courts have the duty to elucidate with particularity the reasons why the lodestar fig-

---

**8.** If a lodestar enhancement were preferred in a case such as this, neither *Laffey* nor any other decision provides guidelines for how great a multiplier is appropriate. The Court would be sorely tempted, for equity's sake, to use a multiplier that would bring Mr. Galloway's fee near the level that a more reasonable hourly rate would have yielded. Such a result would be exactly the kind of "expensive overlay of delusive mathematical form over a process fundamentally grounded in an arbitrary assessment" that Judge Wilkey criticized in *Laffey*. 746 F.2d at 20.

ure was not a "reasonable" compensatory fee.

### Standards for Use of Multipliers

Although the Supreme Court has stated that enhancing the lodestar figure is appropriate in exceptional cases, it has not clearly outlined standards for what constitutes an exceptional case. However, the Court's treatment of fee determinations in "unexceptional" cases gives guidance to lower courts on appropriate factors for evaluating exceptional cases. The Court relies upon private market rates as a point of reference for the determination of fees in the normal case. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548; *Shaw,* 106 S.Ct. at 2957. It presumes that the private bar considers most factors when determining its fees for paying clients.[9] Tracking this market analysis, elements which are not easily or regularly assessed by the private attorney market are proper grounds for adjusting the lodestar.

### 1. Exceptional Results

The Supreme Court has noted that upward adjustments for exceptionally successful suits are proper. *See Blum,* 465 U.S. at 898, 104 S.Ct. at 1548–49; *Delaware Valley,* 106 S.Ct. at 3098. In *Hensley v. Eckhart,* the Court explicitly authorized awarding upward enhancements where a plaintiff has obtained excellent results. 461 U.S. at 435, 103 S.Ct. at 1940. Exceptional success is precisely the type of element not factored into market rates. Since private attorneys cannot foresee their results, they cannot incorporate exceptional results into their hourly fee. Thus exceptional results are unlike "high quality representation," which lawyers are presumed to offer as part of their market rate, and which does not justify enhancing the lodestar. *See Delaware Valley,* 106 S.Ct. at

3098. This Circuit has awarded upward enhancements for exceptionally successful suits in numerous cases. *See Laffey v. Northwestern Airlines, Inc.,* 746 F.2d at 13; *NACV,* 675 F.2d at 1328.

### 2. Contingency

Although the Supreme Court has not explicitly authorized risk as a proper grounds for enhancing the lodestar, *see Blum,* 465 U.S. at fn. 17, 104 S.Ct. at fn. 17, *Delaware Valley,* 106 S.Ct. at 3100, our Court of Appeals has in the past consistently recognized the propriety of upward adjustments based on the relative risk against success and compensation. *See Laffey,* 746 F.2d at 13; *Action on Smoking and Health v. Civil Aeronautics Board,* 724 F.2d 211 (D.C.Cir.1984). However, the burden is particularly heavy when the requested multiplier is based on risk. *Murray v. Weinberg,* 741 F.2d at 1431.

The Court of Appeals has reserved judgment whether upward adjustments based on contingency of result are consistent with Congress' explicit statutory limitation that fees only be awarded to prevailing parties. *See Laffey,* 746 F.2d at 27. *Palmer v. Schultz,* 798 F.2d 508 (D.C.Cir. 1986). The court has speculated that awarding higher fees to attorneys who bring more speculative cases might perversely encourage attorneys to bring marginal cases rather than cases involving a clear violation of rights. Alternatively, the court fears attorneys would file marginal cases to offset the expenses of other unsuccessful suits. *Laffey,* 746 F.2d at 27. *See also* Leubsdorf, The Contingency Factor in Attorney Fee Awards, 90 Yale L.J. 473 (1981).

Defendants invoke these policy arguments to contend that adjustments based

---

**9.** Model Rules of Professional Conduct Rule 1.5(a) (1983) lists eight factors which are meant to guide the practitioner in setting his or her fee:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood ... that the acceptance of the particular employment will

preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed ...; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer ...; (8) whether the fee is fixed or contingent.

on risk are improper in this proceeding. This Court rejects defendants' argument. Permitting adjustments in the lodestar when plaintiffs undertake an exceptionally risky case and achieve broad ranging success would promote Congress' goals. This Court has always understood that Congress chose the traditional "prevailing party" requirement as the threshold to deter meritless claims. Congress in this statute chose an even less rigorous standard for awarding fees, providing courts with the discretion to award fees in "appropriate cases." 30 U.S.C. § 1270. *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983).

A distinction exists between frivolous claims and claims which are meritorious but risky because they pose novel legal issues. As this case illustrates, often a worthwhile case is risky precisely because it is breaking new ground in the law or focusing upon issues of first impression. Nothing in the legislative history of fee shifting provisions indicates that the intent to deter baseless litigation encompasses a desire to deter these meritorious, yet contingent claims. In fact, the broad congressional policy which underpins fee shifting statutes is furthered by enhancing fee awards based on contingency. Congress legislates shifting provisions to encourage citizen participation in the enforcement of statutes and regulations. Authorizing courts to increase the lodestar amount in risky suits which lead to dramatic advances in the law encourages socially beneficial citizen suits.

Moreover, awarding an upward adjustment based on risk is fully consistent with the market model. Providing an enhancement figure in particularly risky cases fulfills the congressional design of placing uncompensated counsel on a par with compensated counsel. S.Rep. No. 94–1011, 94th Cong., 2d Sess. 6 (1976); E. Larson, *Federal Court Awards of Attorneys' Fees*

215 (1981). Hourly market-based rates do not account for the contingent nature of payment. It is true that every attorney faces the risk of non-payment for some work performed on behalf of a client. *Murray*, 741 F.2d at 1431. But, although the average market-based hourly fee reflect some measure of non-recoupment, the private attorney is relatively certain to be paid. However, in cases brought under statutes with fee shifting provisions, the attorneys are only renumerated if their clients prevail on the merits. Thus, if market rates in the private sector are the unit of comparison, then adjustment for contingency should be permitted to ensure an equitable fee determination.[10]

### Multiplier Adjustments in This Proceeding

■ Under the law of this Circuit, three elements must be satisfied to justify an increase in the lodestar figure. These elements incorporate both the contingency factor and the exceptional results factor. They are as follows: (1) The risk of nonpayment was greater than the normal risk of nonpayment and the lodestar rate must not reflect this added risk; (2) the attorneys must not have adequate fee arrangements with their client and therefore must have shouldered a substantial risk of nonpayment; and (3) the success and impact of the case was exceptional. *Murray*, 741 F.2d at 1431.

If this carved-out exception for supplementing the market standard is to be more than just a theoretical possibility, this case is precisely the rare and exceptional case that deserves an enhancement figure. Plaintiffs have clearly met the three requirements recognized in *Murray*. They determined their lodestar rate by referring to the average market based rates prevailing in the community for services paid when rendered. *See* Plaintiffs' Petition for Fees, April 1, 1985 at 51–66. Neither plain-

---

**10.** The Supreme Court has deferred judgment on the propriety of awarding a multiplier for contingency in the Delaware Valley case and Palmer v. Schultz case pending further argument on the question this term. However, given the prohibition in *Shaw* on awarding increases for delay, it would be unfair to further delay this award until the court definitively rules. Thus, we have consciously separated out the enhancement figure from the lodestar determination to ensure that plaintiffs immediately receive their justly deserved fees.

tiffs nor this Court took into account the added risk of total nonpayment when assessing the lodestar amount. *Id.* at 70. And counsel have no fee arrangements with either client. *Id.* Therefore counsel assumed the full risk that the case would not succeed.

Despite the contingent nature of the suit, counsel made a substantial investment both in time and out-of-pocket expense. Counsel invested 2588 hours of attorney time and almost $10,000 in costs all without any assurance of compensation. Moreover they faced defendants who vigorously and unremittingly litigated every aspect of the case. The only possibility of payment for their services was an award of attorneys' fees pursuant to Section 520.

■ Plaintiffs faced substantial risk when commencing this action in 1981. The statute was novel. Major legal questions regarding enforcement provisions and procedural issues were untested. . The gravest element of risk was posed by defendant's venue challenge. Defendants argue that the risk posed by the venue issue was self-imposed and therefore not grounds for an upward adjustment of the lodestar. *See* Defendants' Memorandum in Opposition, May 24, 1985 at 38. This argument is unconvincing. No court has held that contingency adjustments are appropriate only for risks inherent in the claim on the merits.

Moreover, plaintiffs' venue choice was the key to their exceptional results. Section 520(c)(1) provided that actions alleging violations of the Act must be brought in the district in which the affected mines were located. Plaintiffs were challenging nationwide policy. They sought to redress the government's failure to comply with the statute and prosecute any violators. They sought to terminate the mine violations by bringing one consolidated action in the District of Columbia rather than bringing each action individually, at a particular mine site. Despite the high odds of an adverse venue ruling, they filed their claim for relief in the District of Columbia rather than pursue a piecemeal litigation strategy in order to save both judicial and govern-

mental resources and encourage more immediate compliance with the statutory mandate. Their strategy was fraught with risks. Indeed, plaintiffs almost lost their case on the venue issue. The Court of Appeals reversed this Court and remanded the proceeding with directions to dismiss. Plaintiffs' counsel only avoided failure on the merits and the probable consequential loss of all their invested hours and costs by persuading the full court to vacate the panel decision and rehear the case *en banc.*

Plaintiffs' request for a five percent adjustment to compensate for their risk is modest and illustrates their good faith efforts to limit their demands and minimize any strain on the government's coffers. Multipliers of up to fifty percent for risk find ample support in this Circuit. *See Thompson v. Barrett,* 599 F.Supp. at 816 (50% increase); *Vaughn v. Government Printing Office,* No. 77–0787 (D.D.C. July 19, 1982) (75% increase for risk). ' Moreover, Judge Richey of this Court authorized multipliers of ten percent for risk and twenty percent for exceptional success in a separate case challenging another unenforced provision of the statute. *Save Our Cumberland Mountains v. Hodel,* 622 F.Supp. 1160 (D.D.C.1985). Given the identical risk nature of this suit, a five percent adjustment to the lodestar is fully merited.

■ Plaintiffs request a ten percent upward adjustment for the exceptional success of the litigation. Defendants oppose plaintiffs' request. However, their opposition appears almost as a matter of routine. They make no arguments to counter plaintiffs' contentions of dramatic success.

The Court fully agrees that this case achieved a major breakthrough in mining regulation. As discussed above, the suit established a regulatory framework which compelled the government to halt the cycle of massive abuse of the mining lands in Appalachia.

As noted, this action was commenced in an effort to compel the Interior Department to meet its statutory obligations to halt the massive abuse of mining lands in Appalachia and to protect the environment

from irresponsible stripmining practices. 30 U.S.C. § 1201 *et seq.* (1977). The Surface Mining Control and Reclamation Act of 1977 required that coal mining practices be conducted without endangering the environment and required proper and immediate reclamation of the land as soon as mining operations were completed. Despite this legislation, numerous mine operators failed to abide by the mandated environmental controls. They flouted the environmental regulations and continued to use mining techniques designed to maximize the amount of coal extracted in the shortest time possible and neglected to restore the land. The statute remained effectively dormant until 1981 when plaintiffs filed this action to halt the Department's flagrant disregard of the Act and prevent the continued ravaging of the mining lands.

The Department was relentless in its opposition to citizens' efforts to obtain enforcement. The Department objected to taking enforcement actions for past violations, arguing that collections against past violators would be costly and difficult due to the lapse in time and resulting loss of accurate information. It also demanded that the plaintiffs litigate the enforcement of the statute as applied to each individual violator in a separate action and in the immediate area where the violations occurred. Plaintiffs committed considerable time, energy and legal skill to challenge the Department's arguments and obtain judicial intervention and relief.

The case achieved a major breakthrough in finally achieving Congress' goal to effectively regulate strip mining. In fact, once plaintiffs brought the problem to the public's eye, Congress, in turn, began to actively investigate the Department's failure to enforce the Act. Acting in an oversight capacity, the House Committee on Government Operations concluded that the Department of Interior's inability to identify violations and eliminate delays in collecting penalties suggested conscious disregard of the requirements of the statute. H.Rep. No. 12, 99th Cong., 1st Sess. 13 (1985). The Committee recognized that the Department's inaction and mismanagement actually rewarded wrongdoers in the mining in-

dustry and demanded that the Department commence enforcement according to this Court's order immediately. *Id.* at 23. *See also To Review Assessment and Collection of Civil Penalties by the Department of the Interior Under the Surface Mining Control and Reclamation Act,* 98th Cong. 2nd Sess. (1984); *Implementation of the Surface Mining Control and Reclamation Act of 1977,* 88th Cong., 1st Sess. (1983); S.Rep. No. 62 98th Cong., 2d Sess. (1984). By bringing this case, plaintiffs were able to halt the widespread evasion of the Act and begin to reverse the extensive environmental damage caused by irresponsible strip mining. The Committee noted that "much of the activity of the Department was undertaken in response to federal court orders resulting from suits brought by citizen groups." H.R.Rep. No. 62, 98th Cong., 2d Sess. 4 (1984). Our Circuit Court also indicated the importance of the suit by its decision to vacate the panel decision and rehear the case *en banc.* Such action is the exception rather than the rule and occurs only when the "proceeding involve[s] a question of exceptional importance." Fed.R.App.P. 35(a).

Finally, the Court will only apply the combined 15 percent upward adjustment to the time spent on the substance of the litigation. Plaintiffs do not seek and the Court will not award any enhancement to the lodestar for work done on the fee petition.

### C. Costs

Plaintiffs request an award of $9,697.19 for "reasonable litigation costs" as authorized under Section 1270(d) of the Surface Mining Act.

Defendants challenge the plaintiffs' request, arguing that the Act only permits recovery for limited types of "costs." Defendants attempt to create a linguistic distinction between costs and expenses, arguing that the former are limited to statutory costs which would exclude any recovery for expenditures incurred while monitoring the settlement agreement. Additionally defendants argue that the plaintiffs incurred

questionable and unnecessary costs due to overstaffing.

 Defendants' contention that statutory costs preclude reimbursement for monitoring expenses is meritless. As our Circuit Court reasoned in *Laffey*, 746 F.2d at 32, Congress made clear that the same standard for attorneys' fees and costs govern all the myriad statutes which include fee provisions. Courts regularly grant the type of expenses claimed by plaintiffs' attorneys.

In order to recover expenses, plaintiffs must demonstrate that what is claimed is of the type typically passed on to private clients. In *Laffey*, 746 F.2d at 31, the private market was adopted as the standard for recovery for *both* fees and expenses. The Court recognized that most firms pass on various expenses directly to their clients. Two of plaintiffs' private attorneys state in their affidavits that their firms regularly passed on claimed expenses to their clients. Galloway and Rushforth Reply at 37. All of their claimed expenses are fair and reasonable and will be allowed.

 The remaining plaintiffs' attorneys are with public interest firms and since their firms are tax exempt, they do not pass any expenses on to clients. The Supreme Court concluded in *Blum*, 465 U.S. at 894, 104 S.Ct. at 1546–47, that reliance upon a cost-based approach which established varying rates for private versus non-profit counsel would violate the intent of Congress to attract competent counsel to vindicate the public's rights. 465 U.S. at 894–95, 104 S.Ct. at 1546–47. Though the reference and discussion concerned attorneys' fees, the Court's analysis and policy considerations apply equally strongly to the issue of expenses. Requiring public interest lawyers to absorb costs which are regularly billed to clients in other types of cases would discourage attorneys from accepting representation in statutory attorneys' fees cases. Such a reimbursement policy would frustrate the purpose of fee and cost shifting statutes to promote citi-

zen enforcement of important federal policies by ensuring that they will be fully compensated for their efforts. Therefore plaintiffs employed at Advocates are entitled to expenses normally passed on by counsel to private clients.

Plaintiffs are also required to present adequate documentation of the expenses incurred so the court can assess their reasonableness. They have fully complied and have submitted careful documentation of their expenses as well as photocopied receipts. Plaintiffs seek compensation for items which include travel to mine sites for monitoring, photocopying, long distance telephone calls and computer research. Such items are routinely included as compensable costs. *American Jewish Congress v. Kreps*, 574 F.2d 624 (D.D.C.1978); *Parker v. Califano*, 443 F.Supp. 789, 794 (D.D.C.1978). The Court has reviewed plaintiffs' submissions and concludes that their documentation is satisfactory and the claims were reasonably incurred in connection with the litigation.

### CONCLUSION

Based on the foregoing, the Court grants plaintiffs a total award of $392,970.19.[11] This figure reflects the reasonable hours expended by all attorneys, paralegals and law clerks in this proceeding multiplied by a reasonable hourly rate assessed in each year the work was performed. In addition the amount includes a 15 percent upward adjustment for the extreme risk the plaintiffs assumed when pursuing this litigation and the exceptionally successful results they obtained. This upward adjustment was not applied to any hours expended pursuing the attorneys' fees claim. Finally the figure includes $9,697.19 in reasonable costs and expenses. The breakdown of this award is as follows:

| Attorney | Year | Rate | Hours | Lodestar |
|----------|------|------|-------|----------|
| Crisman | 1983 | $150 | 150.5 | $22,575.00 |
| | 1984 | 150 | 66.44 | 9,966.00 |
| | + fees | | 11.31 | 1,696.50 |
| | 1985 | 150 | 83.94 | 12,591.00 |

11. On August 4, 1986, plaintiffs were granted an interim fee award of $77,124. The interim award when deducted from the total award of

$392,970.19 leaves a remaining balance of $315,-846.19.

| Attorney | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Ransel | 1983 | 100 | 66.50 | 6,650.00 |
| | 1984 | 125 | 50.65 | 6,331.25 |
| | 1985 | 125 | 3.75 | 468.75 |
| Goldberg | 1983 | 75 | 14.00 | 1,050.00 |
| | 1984 | 75 | 21.75 | 1,631.25 |
| Preston | 1985 | 75 | 80.75 | 6,056.25 |
| Fitzgerald | 1983 | 75 | 17.75 | 1,331.25 |
| | 1985 | 75 | 18.00 | 1,350.00 |
| Rushforth | 9/81–9/83 | 125 | 131.50 | 16,437.50 |
| | 3/83–2/84 | 140 | 85.30 | 11,942.00 |
| | 3/84– + fees | | 8.20 | 1,148.00 |
| | 8/84 | 150 | 14.90 | 2,235.00 |
| | 9/84–11/84 | 160 | 21.50 | 3,440.00 |
| | 12/84–1985 | 200 | 4.4 | 880.00 |
| MeElfish | 9/81–1/83 | 70 | 151.6 | 10,612.00 |
| | 2/83–8/83 | 80 | 145.00 | 11,600.00 |
| | 9/83– + fees | | 17.80 | 1,424.00 |
| | 11/84 | 90 | 4.8 | 432.00 |
| Galloway | 1981 | 115 | 31.75 | 3,651.25 |
| | 1982 | 125 | 62.00 | 7,750.00 |
| | 1983 | 150 | 427.15 | 64,072.15 |
| | + fees | 150 | 58.00 | 8,700.00 |
| | 1984 | 150 | 510.25 | 76,537.50 |
| | + fees | | 8.75 | 1,312.50 |
| | 1985 | 150 | 48.37 | 7,255.50 |
| | + fees | | 48.82 | 7,323.00 |
| Greenberg | 1983 | 150 | 24.9 | 3,735.00 |
| Bishop | 1981 | 85 | 6.25 | 531.25 |
| | 1982 | 90 | 11.00 | 990.00 |
| | 1983 | 90 | 46.50 | 4,185.00 |
| | + fees | 90 | 28.75 | 2,587.50 |

**Paralegal and Law Clerk time**

| | Hours | Rate | Lodestar |
|---|---|---|---|
| Galloway & Greenberg | 221.25 | $30 | $ 6,637.50 |
| Council for Southern Mts. | 350.00 | $30 | $ 10,500.00 |
| Advocates for Public Interest | 73.20 | $30 | $ 2,196.00 |
| Total Lodestar | | | $339,811.90 |

| Attorney | Year | Rate | Hours | 15% Multiplier (applies only to non-fee work) |
|---|---|---|---|---|
| Crisman | 1983 | $150 | 150.5 | $ 3,886.25 |
| | 1984 | 150 | 66.44 | 1,494.90 |
| | 1985 | 150 | 83.94 | |
| Ransel | 1983 | 100 | 66.50 | 997.50 |
| | 1984 | 125 | 50.65 | 949.69 |
| | 1985 | 125 | 3.75 | |
| Goldberg | 1983 | 75 | 14.00 | 157.50 |
| | 1984 | 75 | 21.75 | 244.69 |
| Preston | 1985 | 75 | 80.75 | |
| Fitzgerald | 1983 | 75 | 17.75 | 199.69 |
| | 1985 | 75 | 18.00 | 205.5 |
| Rushforth | 9/81–9/83 | 125 | 131.50 | 2,469.63 |
| | 3/83–2/84 | 140 | 85.30 | 1,791.30 |
| | 8/84 | 150 | 14.90 | 335.25 |
| | 9/84–11/84 | 160 | 21.50 | 516.00 |
| | 12/84–1985 | 200 | 4.4 | |
| McElfish | 9/81–1/83 | 70 | 151.6 | 1,591.80 |
| | 2/83–8/83 | 80 | 145.00 | 1,740.00 |
| | 11/84 | 90 | 4.8 | 64.80 |

| Attorney | Year | Rate | Hours | 15% Multiplier (applies only to non-fee work) |
|---|---|---|---|---|
| Galloway | 1981 | 115 | 31.75 | 547.69 |
| | 1982 | 125 | 62.00 | 1,162.50 |
| | 1983 | 150 | 427.15 | 9,610.88 |
| | 1984 | 150 | 510.25 | 11,480.63 |
| | 1985 | 150 | 48.37 | 1,088.33 |
| Greenberg | 1983 | 150 | 24.9 | |
| Bishop | 1981 | 85 | 6.25 | 79.69 |
| | 1982 | 90 | 11.00 | 148.50 |
| | 1983 | 90 | 46.50 | 627.75 |

**Paralegals**

| | Rate | Hours | 15% Multiplier |
|---|---|---|---|
| Galloway & Greenberg | $30 | 221.25 | 995.63 |
| Council for Southern Mts. | $30 | 350.00 | 1,575.00 |
| Total Multiplier | | | $ 43,461.17 |
| Plus compensable costs and expenses | | | $ 9,697.19 |
| Total Award | | | $392,970.19 |

An appropriate Order will be entered.