## SAVE OUR CUMBERLAND MOUNTAINS, INC., et al.

v.

**Donald P. HODEL, Secretary of the Interior, et al., Appellants.**

### No. 85–5984.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 8, 1986.

Decided Aug. 7, 1987.
Rehearing En Banc Granted
Oct. 14, 1987.*

---

\* The Order granting rehearing en banc is pub- lished at 830 F.2d 1182.

John Alan Bryson, Atty., Dept. of Justice, with whom Robert Lawrence Klar-quist, Atty., Dept. of Justice, Washington, D.C., was on the brief for appellants.

Joseph A. Yablonski, with whom L. Thomas Galloway, Washington, D.C., was on the brief for appellees. Daniel B. Edelman, Washington, D.C., entered an appearance for appellees.

Before WALD, Chief Judge, and GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.

Opinion concurring in part and dissenting in part filed by Chief Judge WALD.

BORK, Circuit Judge:

This is an appeal from an award of attorneys' fees and expenses under the Surface Mining Control and Reclamation Act of 1977. The government challenges four parts of the district court's award: the reasonableness of the hourly rates, the reasonableness of the number of hours, the propriety of two upward multipliers used in computing the ultimate fee award, and the award of non-taxable costs as expenses. We affirm the award as to the number of hours and the award of non-taxable costs, but reverse as to the hourly rates in the award, the award of a multiplier for exceptional results obtained, and the award of a multiplier for the risk of non-payment.

## I.

Plaintiffs brought suit originally in September 1981, invoking section 520(a) of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1270(a) (1982), the "citizens' suit" provision. The suit alleged that the Secretary of the Interior had improperly failed to enforce the SMCRA against operators who had unlawfully invoked a statutory exemption from the SMCRA's coverage, 30 U.S.C. § 1278(2) (1982), and that the Secretary's suspension and withdrawal of a rule interpreting that exemption had violated the Administrative Procedure Act ("APA"). The district court

dismissed the challenge to the Secretary's failure to enforce the SMCRA for lack of venue under 30 U.S.C. § 1270(c) (1982), and dismissed the APA claim as rendered moot by a supervening rule newly interpreting the exemption. A panel of this court affirmed the dismissals on appeal, resolving a conflict between the district court decision in this case and another district court decision that had reached the opposite conclusion as to venue. Thereafter, the full court vacated the panel's opinion and agreed to rehear the venue issue *en banc*. Before rehearing, the parties settled the issues on appeal. The case was then remanded to the district court, where the Secretary waived the venue defense and the parties reached a final settlement of the action on the merits.

Plaintiffs then applied to the district court for an award of attorneys' fees and costs pursuant to 30 U.S.C. § 1270(d) (1982), which states in part:

> The court, in issuing any final order in any action brought pursuant to [30 U.S.C. § 1270(a)], may award costs of litigation (including attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

The government opposed the application, largely on the grounds also urged to this court. The district court awarded plaintiffs $147,670.96 in fees and costs.[1] *Save Our Cumberland Mountains v. Hodel,* 622 F.Supp. 1160 (D.D.C.1985).

On the question of hourly rates for each of plaintiffs' attorneys in the litigation, the district court found that the rates of $150 per hour for attorneys Yablonski and Galloway, and $110 for attorney Bishop, a colleague of Galloway's, were "reasonable and within the bracket of prevailing rates within this community for similar work." 622 F.Supp. at 1165. In contrast, the district court allowed a rate of $125 per hour for attorney Edelman because this was "his customary billing rate." *Id.* The dis-

trict court indicated through these findings its apparent belief that attorneys Yablonski, Galloway and Bishop had no customary billing rate. Finally, the district court without discussion accepted as "fair and reasonable" the $30 per hour rate proposed by plaintiffs for counsel's paralegals and law clerks. *Id.*

The district court also found that all the hours claimed by the plaintiffs' four attorneys were compensable. 622 F.Supp. at 1164. In particular, the district court rejected the government's contention that since the Secretary's supervening rule mooted the APA claim, all hours spent on that claim in the suit should be disallowed; it held instead that the time spent on the APA claim was compensable since the suit on that claim was a "catalyst" that prompted the Secretary's issuance of the new rule. *Id.* at 1163. The district court also found that the hours spent on the petition to this court for rehearing *en banc* were compensable, thereby rejecting the government's argument that this time was a needless duplication of time spent in a companion case before this court raising the same venue issue. *Id.* at 1164.

Having determined the two principal elements required to compute the attorney's fee award, the district court went on to allow two upward multipliers to this amount. First, the court allowed a 10% increase in compensation for all the hours expended prior to remand to account for the "substantial" risk that plaintiffs' counsel would receive no compensation at all for their work on this litigation. The court based this award on the high "degree of difficulty the plaintiffs faced in having their case heard at all in this district, much less prevailing on all the issues." 622 F.Supp. at 1166. Second, the district court granted a 50% increase in compensation for the hours spent on the rehearing petition, finding that counsel's success in obtaining rehearing *en banc* by this court of a unani-

---

1. This amount was in addition to a prior $50,-000 payment to plaintiffs from the government. *Save Our Cumberland Mountains v. Hodel,* 622 F.Supp. 1160, 1167 (D.D.C.1985). The parties had agreed in their settlement that the govern- ment would pay that amount to plaintiffs for preparing an inventory of mine sites whose exemption from the SMCRA was at issue in the litigation.

mous panel decision was "most certainly an exceptional result." *Id.* at 1166–67.

Finally, the district court allowed all of counsel's costs and expenses, deeming them reasonable in amount and of the type "routinely passed on to clients." 622 F.Supp. at 1167.

## II.

### A.

The attorney's fee statute before us does not expressly require that a party "prevail" to receive an award of fees, nor does it require that the award be "reasonable"; instead, it simply empowers the court to award fees to "any party, whenever the court determines such award is appropriate." 30 U.S.C. § 1270(d) (1982). Nonetheless, the Supreme Court has found that an identically worded fee statute in the Clean Air Act, 42 U.S.C. § 7604(d) (1982), should be interpreted in accord with the more abundant jurisprudence addressing the attorney's fee provision in the Civil Rights Act, 42 U.S.C. § 1988 (1982), and other statutes that award a "reasonable" attorney's fee to a "prevailing" party. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*). *See id.* 106 S.Ct. at 3095–96 ("nearly identical" purposes of § 7604 and § 1988 suggest that similar interpretation appropriate). Specifically, the Court applied to the statute the "lodestar" approach developed for judicial determination of a "reasonable" attorney's fee: for each attorney the court compounds a reasonable hourly rate with the number of hours reasonably spent on the litigation to arrive at a "lodestar" (the presumptively reasonable fee), which the court may then adjust if necessary in particular situations. *Id.,* 106 S.Ct. at 3096–3100.

■ Thus, we are bound to apply the lodestar approach to the fee request before us. *See also Ruckelshaus v. Sierra Club,* 463 U.S. 680, 682 n. 1, 103 S.Ct. 3274, 3276 n. 1, 77 L.Ed.2d 938 (1983) (noting identity of 42 U.S.C. § 7607(f) with, *inter alia,* 42 U.S.C. § 7604(d) and 30 U.S.C. § 1270(d)

and stating that interpretation of statutory term "appropriate" is same in each statute). Our review of the district court's fee award is restricted to the questions of whether the district court applied improper legal standards or abused its discretion. *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Copeland v. Marshall,* 641 F.2d 880, 901 (D.C.Cir.1980) (en banc). We first address the government's challenge to the hourly rates approved by the district court.

### B.

The government challenges on two grounds the district court's finding that the $150 hourly rate proposed by plaintiffs for Yablonski and Galloway was reasonable and suggests instead a rate of $100 per hour. First, the government argues, contrary to the district court's apparent conclusion, that Yablonski and Galloway each had a customary billing rate of approximately $100 per hour. Second, the government argues that even if the two attorneys had no such billing rate, the market rate for comparable attorneys in the Washington market was not $150 per hour but $100 per hour.

■ The question of how to select a reasonable hourly rate for an attorney's fee award was settled in broad terms by the Supreme Court in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum,* which involved a statutory fee request by salaried Legal Aid Society attorneys, the Court held that the prevailing market rate for similar legal services by comparable lawyers in the community provides the proper measure of the hourly rate for fee applicants. *Id.* at 892–96, 104 S.Ct. at 1545–47. The Court further noted that "the rates charged in private representations may afford relevant comparisons" to fix the reasonable hourly rate. *Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11. In this circuit, the rule is more specific: if an attorney has a customary billing rate, that rate constitutes the presumptively reasonable rate to use in computing a fee award. In general, only if the attorney himself has no customary billing rate may the court

base its fee award on a composite average market hourly rate. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984). As *Laffey* explains, adoption of counsel's customary hourly rate as presumptively reasonable is simply a means of finding an hourly rate for the services rendered sufficient for the client to have obtained competent counsel absent the fee statute. *Id.* at 18. *See, e.g., Blum*, 465 U.S. at 893–94, 104 S.Ct. at 1546 (quoting legislative history); *Hensley*, 461 U.S. at 430 n. 4, 103 S.Ct. at 1938 n. 4 (same).

Both Yablonski and Galloway were members of private law firms throughout this litigation. Yablonski has indicated by affidavit that he billed by the hour in 20% to 50% of the cases he handled from 1981 through 1985, the time this litigation was underway, at an average rate of $100 per hour. The balance of his fees during that time was paid through contingent arrangements. Galloway has indicated by affidavit that most of his practice during the time of this litigation was spent in the representation of clients whom he billed based on their ability to pay (and whom in some cases he represented at no cost). As an example of this practice, Galloway stated further that his "reduced rate" for "national environmental and conservation groups" ranged from $75 to $100 per hour.

■ We hold that Yablonski and Galloway each should receive compensation of $100 per hour for this litigation. Yablonski presents the simpler case. He suggests only that his large proportion of contingent fee cases renders the hourly rate he otherwise uses inapposite as a reasonable fee. But the fact that counsel charges by the hour in only some of his cases does not make that hourly rate suspect. The attorney is in a far better position than a court to know what a reasonable hourly rate is for him. And the hourly rate he actually

and willingly charges provides the court with a more accurate approximation of the reasonable hourly rate for his services, as required by the lodestar procedure, than any judicial evaluation of the market. *See Laffey*, 746 F.2d at 18 (for attorneys *"who at least in part"* charge by the hour, hourly charge is "the best evidence of the value of their time") (quoting Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 321 (1977)). The fact that Yablonski often or even usually is paid through contingent arrangements does nothing to impeach the presumptive reasonableness of the hourly rate he himself has set, which by definition would suffice to "attract competent counsel"—Yablonski himself.[2]

■ Galloway's maximum hourly rate is $100, which we find is his reasonable hourly rate. This gives Galloway the benefit of any doubt by fixing his rate at the high end of the range of rates he charges according to the ability of his various clients to pay. As with Yablonski, not all of Galloway's work is done for an hourly rate—Galloway represents without compensation clients who can afford no fee. But as with Yablonski, we regard this fact as irrelevant: his complete waiver of charges for some clients does nothing to impeach the reasonableness of the hourly rates he does charge. And that Galloway varies his hourly rate with the client's ability to pay is also of no consequence. This court's precedents foreclose any such argument. The *Laffey* decision rejected the argument that counsel's hourly rate should not be taken as presumptively reasonable because counsel chooses to charge his clients a rate below counsel's putative reasonable rate. 746 F.2d at 14 n. 69. *Accord Sierra Club v. EPA*, 769 F.2d 796, 811–12 (D.C.Cir.1985) (counsel's preparation of non-profit group's fee request compensated not at his rate

2. Indeed, it is Yablonski's contingent earnings that are an inadequate measure of his reasonable hourly rate, since such earnings by definition already include a multiplier for the risk of not prevailing in the litigation. One might be able to arrive at a reasonable hourly rate for a contingent fee practice, but only by dividing counsel's fees received by the total hours expended on both winning and losing cases. And in any event reference to contingent fee arrangements may be inappropriate for determination of the proper rate for litigation aimed not at relief in damages but at non-monetary relief. *See Kirchoff v. Flynn*, 786 F.2d 320, 324–28 (7th Cir.1986).

generally charged to commercial customers but at his rate generally charged to non-profit groups). The law firm before the *Laffey* panel sought fees based on composite market rates rather than on its own, admittedly lower, hourly billing rates. Similarly to Galloway, the firm conceded that its lower rates simply "reflect[ed] the value its lawyers put on serving 'good' clients," whom they represented at low rates for the "personal satisfactions" they obtained from serving those clients. 746 F.2d at 14 n. 69. The court found that the firm's rates nonetheless must serve as counsel's reasonable hourly rates under the fee statute, because the court could not adjust counsel's rates "to reflect the lost income due to 'personal satisfactions.'" *Id.* Whether or not *Laffey's* position on this point is correct—and the dissent presents a serious argument that it may not be—this panel is bound by that position as the law of the circuit.

It must in addition be said, however, that the purpose behind the fee statute provides support for the *Laffey* panel's view. If a lower dollar price suffices to attract competent counsel in general, and Galloway in particular, to the litigation generated by certain clients than the price that would attract them to other litigation, that lower price is a presumptively reasonable hourly rate under the statute for such litigation. So long as a statutory fee award is sufficient to satisfy the monetary goal of like attorneys who would take on like cases absent a fee statute, the purpose of the fee statute is satisfied.

The Supreme Court's decision in *Blum v. Stenson* is not to the contrary. In *Blum*, the Court held that the proper hourly compensation under the Civil Rights Attorneys

Fee Act for salaried attorneys of the Legal Aid Society was not the actual cost of their services, *i.e.*, a ratable portion of their salaries, but the prevailing market rate for similar services by similar attorneys. 465 U.S. at 892–96, 104 S.Ct. at 1545–47. Petitioner had argued that a cost-based standard was appropriate in all fee awards, *id.* at 892, 104 S.Ct. at 1545–46, while the United States had urged such a standard solely for "non-profit legal aid organizations," *id.* at 892–93, 104 S.Ct. at 1546. The Court rejected both arguments by reference to judicial decisions cited with approval in the fee statute's legislative history. *Id.* at 894–95, 104 S.Ct. at 1546–47. But nothing in *Blum* suggests that an attorney who receives not a salary from donors but fees from clients is not reasonably compensated under the fee statute by reference to his own fees. Since by definition there is no market rate except a composite average market rate for a salaried attorney, we see no reason to read *Blum*, a case concerning salaried attorneys, as requiring us to blind ourselves to counsel's own rates, if they are available. And as *Blum* expressly states, it is "clear" that "Congress *did not intend the calculation of fee awards to vary* depending on whether plaintiff was represented by private counsel or by a non-profit legal services organization." *Id.* at 894, 104 S.Ct. at 1547 (emphasis added). Consequently, we may not vary the fee calculation by disregarding Galloway's own hourly rates simply because he charges rates based on his clients' ability to pay and thereby resembles a "nonprofit legal services organization" that charges no client any fees.[3]

We conclude that a rate of $100 per hour is the reasonable hourly rate at which to

---

**3.** The court in determining counsel's reasonable rate also properly disregards "abnormally high or low rates" charged by counsel in comparison with the market's range of rates. *Laffey*, 746 F.2d at 20 & n. 100. But the government here has provided evidence corroborative of the consistency between Yablonski's and Galloway's $100 hourly rate and comparable area market rates. To select the $150 hourly rate it used, the district court relied on the schedule of fees for the Washington area established by the district court in *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 371 (D.D.C.1983), which was not addressed in the appeal from that decision. 622 F.Supp. at 1165. The government, however, has indicated by reference to the District of Columbia's 1984 Lawyer Directory that at the time of this litigation numerous practitioners in the administrative law and civil practice areas charged fees in the range of $75 to $100 per hour. At the least, the government's submission suggests that the *Laffey* schedule was skewed toward the high end of the pertinent Washington legal market. We find that a rate of $100 per hour for these attorneys is not "abnormally high or low."

compensate Yablonski and Galloway for their services in this case.

### C.

■ The rate we adopt for Yablonski and Galloway is based on the market rate for legal services at the time these two attorneys worked on this case. But the customary billing rate of $125 and $110 per hour allowed by the district court for attorneys Edelman and Bishop, respectively, and the $30 per hour rate allowed for the paralegals and law clerks who worked on this case, are current rate charges. It is now clear that the award against the United States of attorneys' fees and expenses at current rates, absent consent by the United States, is barred by the doctrine of sovereign immunity. *See Library of Congress v. Shaw*, — U.S. —, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). In *Shaw*, the Court held that in the fee statute for Title VII suits, 42 U.S.C. § 2000e–5(k) (1982), the United States had not consented to pay interest on an attorney's fee award to compensate for delay in payment. Nothing in the SMCRA fee statute suggests that the United States has consented to an award of interest against it. The use of a current hourly rate to pay for work done at a time when rates were lower is simply a forbidden award of interest under another name. *See Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C.Cir.1984) (current market rates equal historic rates plus compensation for delay). Indeed, *Shaw* squarely indicated that any mechanism "designed to compensate for the belated receipt of money" is barred by the no-interest rule. 106 S.Ct. at 2965.

■ Although plaintiffs expressly stated in their fee application that they requested current rates "to account for delay," Joint Appendix ("J.A.") at 154 n. *, at oral argument plaintiffs nonetheless suggested that current rates may properly be awarded for administrative convenience. But there is no obvious administrative inconvenience in requiring attorneys to provide the court with the rates they charged at the time they performed the services for which they seek payment. More important, although we do not doubt that ease of administration is desirable, *see Murray*, 741 F.2d at 1433, a judicial "policy" favoring administrative convenience, "no matter how compelling, is insufficient, standing alone, to waive [sovereign] immunity." *Shaw*, 106 S.Ct. at 2965. We accordingly remand for the district court to recalculate the fee awards to Edelman and Bishop and the award for use of paralegals and law clerks, using historical billing rates contemporaneous with the work done.[4]

### III.

The government principally objects to two elements of the billable hours allowed by the district court: all of the hours spent on the APA claim and allegedly duplicative hours spent on the rehearing petition. We affirm the district court on each of these allowances.[5]

### A.

The government urges that plaintiffs should receive no compensation for time spent on the claim that the Secretary's 1981 withdrawal of his "two-acre" rule without opportunity for notice and comment was illegal under the APA, a claim rendered moot by the Secretary's promulgation of a superseding rule. The government argues that because the Secretary was going to promulgate the new rule regardless of the outcome of this litigation, plaintiffs did not prevail on this claim, and no compensation for any time spent on the claim is allowable. We reject the government's position.

---

4. On remand, the district court must also determine the customary billing rates for paralegals and law clerks of the two law firms, since the district court in contravention of *Laffey* needlessly employed a $30 per hour market rate for paralegals and clerks rather than their historical customary billing rate at these firms.

5. The government also suggests that the 75 hours spent by plaintiffs' counsel in preparation of their fee application is unreasonably high. We find that the district court did not abuse its discretion in holding to the contrary.

■ Although we note that the fee statute governing this case does not require a party to "prevail," an award of fees to a party for attorney time that did not result in the relief sought through expenditure of that time would probably not be the "appropriate" award the statute requires. 30 U.S.C. § 1270(d) (1982). *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (construing identical language to hold that party must at least partially prevail to receive a fee award). But, as the decisions under other fee statutes indicate, to permit a fee award a party's litigation efforts need not be the demonstrably exclusive cause of the relief it sought; rather, the party may receive an award for time spent on activities that served as a "catalyst" or contributing factor to that result. *See, e.g., Environmental Defense Fund, Inc. v. EPA*, 716 F.2d 915, 919 (D.C.Cir.1983); *Ross v. Horn*, 598 F.2d 1312, 1322 (3d Cir.1979). Moreover, the temporal sequence of plaintiff's litigation followed by defendant's remedial activity is strong evidence of a causal relationship. *See Pope v. Railroad Retirement Bd.*, 744 F.2d 868, 870 (D.C.Cir.1984) (new agency procedures promulgated while suit pending warranted inference that "the threat of judicial compulsion had a coercive effect on the [agency's] self-styled voluntary actions"); *Ross*, 598 F.2d at 1322 (chronology "strongly suggests" a "causal relationship").

■ The government suggests that plaintiffs' suit was not a catalyst for the issuance of a new two-acre rule because the Secretary had indicated when he withdrew the old rule, prior to the onset of this litigation, that he would later promulgate a superseding rule. 46 Fed.Reg. 40,650 (1981). Recognizing that the Secretary had said this, we nonetheless see no reason to disturb the district court's finding, consistent with the precedents cited above, that the Secretary's promulgation of the new rule at the particular time he did so was prompted at least in part by plaintiffs' litigation. We reach this conclusion because agencies routinely withdraw rules with a promise of subsequently replacing them, but nothing requires the agency to follow up on that promise; because the Secretary here could have issued a rule contrary to that sought by plaintiffs, but promulgated one that promoted their position; and because the Secretary's statement was simply insufficient to rebut the strong implication of causation arising from subsequent events.

■ The government also suggests that the Secretary's retroactive application of the new rule, a condition sought by the plaintiffs and agreed to by the government in the settlement, granted plaintiffs no greater assurance than they had had before on this point, since the government believed and still believes that retroactive effect was needless to achieve plaintiffs' goals. That is, the government asserts that either the new rule retrospectively applied or the old rule prospectively applied would result in the same treatment of any given mine site; the new rule would simply spell out with specificity the factors the Secretary must use in reaching his conclusions as to a given site. J.A. at 44. But we are not prepared to find that plaintiffs gained nothing by pursuing this issue, when the government itself had opposed the retroactive application plaintiffs sought. *Id.* Together with the ultimate settlement embodying plaintiffs' position, the time previously spent by defendants' counsel in opposition to plaintiffs' request for retroactive application shows that the time spent by plaintiffs' counsel on this issue was not wasted but compensable. *See Grano v. Barry*, 783 F.2d 1104, 1113 (D.C.Cir.1986) (defendants may not complain about fee award for plaintiffs' opposition to their appeal of issue found moot).

### B.

■ The other objection to the hours expended requires only brief discussion. The government contends that the hours spent on the petition for rehearing in this court were redundant, since a parallel case brought by two of the plaintiffs here also sought rehearing *en banc* on the same issue. But, as the district court noted, at no point were the two cases consolidated

for argument or decision, and separate rehearing petitions were filed. 622 F.Supp. at 1164. *See* J.A. at 334. We thus are in no position to take into account time spent by some of plaintiffs' counsel in this case on the rehearing petition in the parallel case, and do not disturb the district court's finding that the hours spent on the rehearing petition in this case are reasonable and therefore fully compensable.

### IV.

The government challenges each of the two multipliers that the district court used in computing the final award: one of 50% to time spent on rehearing, for the "exceptional success" of obtaining rehearing *en banc,* and one of 10% to all time spent prior to settlement, for the risk of not prevailing at all. We reverse the award of each multiplier.

### A.

The district court awarded a 50% multiplier to the 44.75 hours plaintiffs' counsel spent preparing the petition for rehearing on the venue issue, on the ground that the result obtained, a grant of rehearing *en banc* in the face of a unanimous panel opinion, was exceptional. The government does not dispute the district court's finding that such a rehearing is a rare event. It rather argues that rarity of result alone does not demonstrate that the lodestar figure for work on the petition is inadequate. The district court, according to the government, must also find specifically that the lodestar figure is not itself reasonable compensation for the work at issue. Moreover, the government claims that a merely "procedural" success, such as obtaining rehearing, may not trigger an enhancement to the lodestar, and that, in any event, a grant of rehearing results primarily from the character of the case itself rather than from the efforts of the attorneys involved.

Although the Supreme Court has clearly indicated that "in some cases of exceptional success an enhanced award [of fees] may be justified," *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940, the Court nonetheless has never upheld any enhanced award that has

reached it. *See Delaware Valley I,* 106 S.Ct. at 3096–3100 (reversing award of upward multiplier); *Blum,* 465 U.S. at 898–902, 104 S.Ct. at 1548–50 (reversing award of upward multiplier); *Hensley,* 461 U.S. at 438–40, 103 S.Ct. at 1942–43 (vacating and remanding award embodying failure to employ downward multiplier). The Court's positive guidance on what would constitute an allowable upward multiplier is therefore limited, particularly since the Court has also not provided any hypothetical examples of success properly deemed "exceptional" and deserving of a multiplier. What the Court has emphatically indicated is that "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate," *Delaware Valley I,* 106 S.Ct. at 3099, so that there is "very little room for enhancing the [lodestar] award based on [counsel's] post-engagement performance," *id.* at 3098. In its most recent rejection of the award of an upward multiplier, the Court summarized its reasoning by stating that "there is no indication [in the evidence or findings below] as to why the lodestar did not provide a reasonable fee award reflecting the quality of representation." *Id.* at 3099. We agree with the government that the Supreme Court requires more than a finding that counsel attained an "exceptional" result; the awarding court must also specifically explain "why the quality of representation [required to produce that result] was not fully reflected in the product of the reasonable number of hours times the reasonable hourly rate." *Id.* at 3100; *accord Blum,* 465 U.S. at 899, 104 S.Ct. at 1549.

 The district court's award of a 50% multiplier for success failed to satisfy either of the two parts of the standard laid down by the Supreme Court. First, although we agree that rehearing *en banc* may be a statistically rare event, we nonetheless do not find that the mere fact that such rehearing is granted constitutes an "exceptional success" that supports the award of a multiplier. As the Supreme Court's decisions indicate, an exceptional results multiplier is meant to compensate

counsel for work of exceptional quality as to which the lodestar award is inadequate. But the rarity of rehearing by a court of appeals *en banc* is not due to any rarity of legal work of exceptional quality. Rather, a full appeals court rarely grants rehearing because it rarely is presented with a case that must be considered *en banc* either "to secure or maintain uniformity of its decisions" or to address "a question of exceptional importance." Fed.R.App.P. 35(a). To achieve rehearing on these grounds does not in itself demonstrate exceptional skill on the part of counsel. An attorney who obtains rehearing *en banc* in a case that implicates the court's concern for consistency or exceptionally important questions may well have represented his client with routine rather than exceptional competence. A grant of rehearing simply contains no necessary implication that counsel's representation was above average.

■ Second, even if the grant of rehearing in this case did result from efforts of exceptional quality by counsel, the district court offered no explanation whatever of why the reasonable hourly rates included in the lodestar did not fully compensate counsel for these efforts. We see nothing to satisfy the Supreme Court's requirement that the fee applicant must offer, and the awarding court accept as conclusive, specific evidence to show that the quality of service rendered was superior to what one reasonably would expect to be compensated for by the lodestar's hourly rates. *Delaware Valley I*, 106 S.Ct. at 3100; *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549. On this ground as well, the district court's award of a success multiplier cannot stand.

### B.

The issue of whether it is ever appropriate for a court to award a multiplier for the risk of loss, *i.e.*, for the risk that counsel may never receive payment for his services, has recently been decided by the Supreme Court. *Pennsylvania v. Delaware*

*Valley Citizens' Council for Clean Air*, — U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*). There, the Court held that such a multiplier could be awarded under attorney's fee statutes, but only if based upon an assessment of market treatment of contingency cases as a class, rather than an assessment of any particular case's degree of risk. — U.S. at ——, 107 S.Ct. at 3089–90 (O'Connor, J., concurring).[6] The novelty and difficulty presented by a particular case is fully reflected in the lodestar and cannot support its enhancement. *Id.* at ——, 107 S.Ct. at 3088 (plurality opinion); *id.* at ——, 107 S.Ct. at 3089–90 (O'Connor, J., concurring). The Court accordingly reversed the award before it, which was based on risks unique to the case. *Id.* at ——, 107 S.Ct. at 3087–88 (plurality opinion); *id.* at ——, 107 S.Ct. at 3091 (O'Connor, J., concurring).

■ Since the district court in this case based its award of a non-payment multiplier on the difficulty for plaintiffs of the venue issue in this case, 622 F.Supp. at 1166, *i.e.*, the court's assessment of the difficulty and risk unique to this case, *Delaware Valley II* compels us to reverse the district court's award of a 10% risk multiplier.

### V.

■ Finally, we hold that the United States has waived its sovereign immunity from an award of non-taxable litigation expenses in this case and affirm the district court's award of non-taxable costs.

The fee statute before us permits the judicial award against the government of "costs of litigation (including attorney and expert witness fees)." 30 U.S.C. § 1270(d) (1982). We of course agree that this provision is a limited waiver of sovereign immunity that must be strictly construed. *Shaw*, 106 S.Ct. at 2963. But we also "must be careful not to assume the authority to narrow the waiver that Congress intended, or construe the waiver unduly

---

**6.** Justice O'Connor's concurring opinion, which in the absence of a majority opinion provides the narrowest rationale for the Supreme Court's disposition of the judgment before it, constitutes the Court's holding in the case. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

restrictively." *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 2029, 90 L.Ed.2d 462 (1986) (citations and internal quotation marks omitted) (construing statute of limitations). We believe that it would be unduly restrictive to find that neither the general term "costs of litigation" nor the term "attorneys fees" includes incidental expenses of attorneys that are routine to all litigation and routinely billed to private clients.[7] *Sierra Club v. EPA*, 769 F.2d 796, 812 (D.C.Cir.1985) (construing wording identical with 30 U.S.C. § 1270(d) to allow routine attorney expenses beyond those taxable by statute); *see also Laffey*, 746 F.2d at 30 (allowing award of expenses not included in overhead against private defendant); *Northcross v. Board of Educ.*, 611 F.2d 624, 639–40 (6th Cir.1979) (same).

## VI.

Judicial award of attorneys' fees under a statutory scheme such as that here uncomfortably resembles judicial ratemaking. The Supreme Court has sought to limit this resemblance, especially through its adoption of the market rate as an objective measure of the presumptively reasonable rate and of the lodestar as the presumptively reasonable fee award. A large area of indeterminacy nonetheless remains, in which sound judicial discretion is the only guide. We believe the district court attempted to exercise its discretion responsibly in this case and in large part succeeded. Nonetheless, in certain aspects of its disposition the district court's attempt fell short. It abused its discretion and also committed legal error in arriving at the hourly rates used in the lodestar and in enhancing the lodestar with multipliers. Accordingly, we reverse the award of a lodestar incorporating a $150 hourly rate for attorneys Yablonski and Galloway and find that a $100 hourly rate must be used for their services, reverse and remand to the district court for incorporation of billing rates charged at the time the work was done rather than current customary hourly rates for the other attorneys and paraprofessionals, and reverse the award of a 50% success multiplier and a 10% risk multiplier. In all other respects, we affirm the award of the district court.

*It is so ordered.*

RUTH BADER GINSBURG, Circuit Judge, concurring:

This court's "lodestar" determination in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984), *affirming in part and remanding in part* 572 F.Supp. 354 (D.D.C.1983), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985), Chief Judge Wald points out, is of questionable consistency with *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and bears reexamination. I agree. I do not believe Congress envisioned one fee calculation regime for legal aid attorneys along with "[t]he highest paid law firm in town," Dissent at 60, and another cut-price one for firms such as Bredhoff & Kaiser, and lawyers situated as are Yablonski and Galloway. Thus, were we deciding initially what fee calculation regime is most compatible with congressional intent, I would vote to treat all fee seekers in the *Blum* manner.

*Laffey*, however, is law of the circuit "whether or not [it] is correct," Court's Opinion at 49, and binds us unless and until overturned by the court en banc or by Higher Authority. Chief Judge Wald finds a way out for Galloway because Galloway's "rate … *ranges* from $75–$100 per hour." Galloway Affidavit, Joint Appendix at 180 (emphasis supplied). But owing to *Laffey*, Chief Judge Wald concedes, a Yablonski or a Bredhoff & Kaiser attorney is locked into an established cut rate of $100 per hour charged to a worthy but not wealthy clientele, even when that established rate is

---

**7.** To eliminate any doubt on this point, we state here that this category includes the reasonable charges for legal paraprofessionals not included

in overhead, and computed in accord with the rules for computation of reasonable attorneys'

subject to negotiation down, say to $75.* Such distinctions invite manipulation and dispute. I would revisit *Laffey,* but while it is our precedent, I resist an end run around it.

WALD, Chief Judge, concurring in part, dissenting in part:

The panel today holds that if an attorney has ever billed any particular type of client by the hour, then the highest rate he has in the past charged for that type of client may be used as the measure for the attorney's statutory fee compensation, regardless of whether the rate is established or merely ad hoc, and regardless of whether it accurately reflects the prevailing community market rate for the lawyer's services, as prescribed by Congress. The path down which this circuit started in *Laffey* leads farther and farther away from Congress' purpose in providing reasonable attorneys' fees to prevailing parties. I dissent from the panel's part II.B. determination regarding Galloway's fee not only because on *Laffey*'s own terms, Galloway's rate policy is distinguishable from that of Bredhoff & Kaiser, the firm involved in *Laffey,* but also because the application of *Laffey*'s reasoning to Galloway's case places in bas relief the need for a fundamental reevaluation of *Laffey* itself.

### I.

"To reduce the arbitrariness characteristic of court awards of attorneys fees, the Supreme Court ... intervened [in 1983] and approved a version of the lodestar method of setting rates." *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 12 (D.C.Cir. 1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct.

3488, 87 L.Ed.2d 622 (1985). The Court held that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The lodestar method was again at issue a year later in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum,* the government had argued that fee awards to nonprofit legal aid groups should be based on the cost of providing legal services, while for-profit firms should receive fees based on the prevailing market rate. The Court rejected that dichotomy, instead holding that "[i]t is ... clear from the legislative history that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a non-profit legal services organization." *Id.* at 894, 104 S.Ct. 1547. Thus, " 'reasonable fees' under § 1981 [1] are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Id.* at 895, 104 S.Ct. at 1547.

The Court noted that as far as legal services attorneys were concerned, "the rates charged in private representations may afford relevant comparisons" to what the "market rate" for their services would be. *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11. The following paragraph refers to several ways in which an attorney may seek to prove the prevailing community rate "for similar services by lawyers of reasonably

---

fees. As noted above, the charges in this case must be remanded for recomputation.

\* Far from "arbitrarily" pulling out of a hat "one of [Galloway's] many different hourly rates," *see* Dissent at 58, the court has awarded Galloway the top rate in the sole range Galloway chose to set out in his affidavit, *see* Court's Opinion at 48; following today's decision, the court would be obliged to take the same approach in calculating the fee of every other similarly situated "idealistic lawyer." *See* Dissent at 60. The top rate in Galloway's range is as "easily ascertained" and "predictable" as is Bredhoff & Kai-

ser's hourly rate, a rate Bredhoff & Kaiser determined by "the[ ] ability to pay" of "the particular clients the firm ch[ose] to represent." *Laffey,* 572 F.Supp. at 372. *But see* Dissent at 57–58 (disregarding, in finding uncertainty and unpredictability, that the court has determined the appropriate rate to be the top one Galloway set out in his affidavit).

1. As the panel points out, the jurisprudence addressing 42 U.S.C. § 1988 is appropriately applied to a fees statute such as 30 U.S.C. § 1270(d), which is at issue in this case.

comparable skill, experience, and reputation." *Id.* Viewed in context, the reference to private rates is simply an indication of one type of evidence a nonprofit attorney might use to show the prevailing community rate for his services. Yet, in *Laffey*, this circuit converted *Blum*'s reference to "the rates charged in private representations" into a virtually unrebuttable presumption that an attorney's established hourly billing rate, whatever considerations it is based on, is an appropriate proxy for the prevailing market rate for his services in the relevant community. Thus, even if a firm could prove that the prevailing community rate for services of the kind it was providing was substantially higher than the rate it was actually charging, the actual rates would nonetheless constitute a cap on that firm's "reasonable" attorneys' fee.[2]

Much of our discussion in *Laffey* relied upon the practical difficulties of determining the prevailing community rate for a particular kind of legal service based on affidavits or other evidence of market value for that service. The court reasoned that a firm with an established billing practice has on its own determined the opportunity cost of its services; its established rate is, in other words, the price at which it must be compensated in order to displace other paying clients.

The problem with the *Laffey* established rate benchmark is that it may or may not dovetail with the "prevailing market rate[ ] in the relevant community" that the Supreme Court in *Blum* held to be the measure of a reasonable attorneys' fee, for either private counsel or nonprofit legal organizations. *Blum*, 465 U.S. at 894–95, 104 S.Ct. at 1546–47. The rate a firm ordinarily charges for its services is not by any means the only relevant evidence of the prevailing market rate in the community for comparable services.[3] *Laffey* itself in fact recognizes that a court must "bracket" the established hourly rate by determining that it "falls within the rates charged by other firms for similar work in the same community." 746 F.2d at 24–25. Firms do exist that consciously eschew profit for public service and that set their rates below those they might demand based on qualifications and experience in order to serve particular needs and clienteles. Often these rates are based on a combination of what the client can pay and what the lawyers need to survive, rather

---

2. Although in most cases the rate an attorney charges will indeed serve as a cap on his statutory award, *Laffey* requires the court to "'bracket' this rate by establishing that it falls within the rates charged by other firms for similar work in the same community." 746 F.2d at 24–25. Galloway "has been practicing for almost twelve years in a very specialized field in which he has become a noted authority and leading national expert." *Save Our Cumberland Mountains, Inc. v. Hodel*, 622 F.Supp. 1160, 1165 (D.D.C.1985). Since *Laffey* only permits an attorney's established hourly rate to serve as the proxy of the prevailing community market rate for his services if that rate falls within the bracket for similar work in the community, I am surprised that the panel, supposedly following *Laffey* so closely, undertakes only the most cursory evaluation of whether $100 per hour is an "abnormally high or low rate" in the overall market for generally similar cases, *see* Maj. Op. at n. 3, and undertakes no evaluation at all of whether $100 per hour is within the particularized rate bracket for a lawyer of Galloway's experience and credentials.

The panel does cite to the District of Columbia Bar's 1984 Lawyer Directory, Maj. op. at n. 3, which reveals a variety of lawyers practicing

in the administrative law and civil practice areas for $75 to $100 per hour. However, even a cursory glance at the Directory reveals that a substantial portion of area lawyers is not listed at all, and most of those that are listed do not include any hourly fee information in their listing; it is entirely optional whether to list fees, and no attempt is made in the Directory to correlate fees with experience, reputation, or expertise in specific areas. The avowed purpose of the Directory is not to compile an accurate representation of prevailing market rates; rather, the Directory itself proclaims that it "has been compiled by the District of Columbia Bar to help people find lawyers." Directory at v. The Directory ought not be used as evidence of community rates, and certainly not of the prevailing community market rate for a lawyer of Galloway's credentials.

3. Lest one think that an award based on the prevailing rate in a community is somehow a windfall to a firm that ordinarily charges less, *Blum* clearly holds that "[w]e cannot assume that Congress would endorse the standards used in [cases relying upon community rates], if fee awards based on market rates were viewed as the kind of 'windfall profits' it expressly intended to prohibit." *Id.* at 895, 104 S.Ct. at 1547.

than on what the lawyers' talents alone can command in the marketplace.

In retrospect, *Laffey*'s attempt to reduce *Blum*'s "prevailing market rate" standard to a more certain measure may have set us on a course at odds with *Blum* itself. As applied to standard private law firms that have an established billing practice, *Laffey* still makes some sense. But for the myriad of unconventional hybrid firms where major efforts are devoted to serving non-paying or lower than market rate clients, it may well be an unmitigated disaster, both for the lawyers involved and for the statutory purposes of the attorneys' fee provisions.

Galloway, as the panel concedes, has no customary billing rate, but merely charges his clients based on their ability to pay.[4] The $75–$100 per hour that Galloway in his affidavit said he charges national environmental groups serves merely as an example of how his general pay-what-you-can policy applies in the case of certain clients.[5]

If we are to meet Congress' mandate of awarding attorneys' fees based on the prevailing community market rate for a lawyer's services, the *Laffey* presumption that an "established" hourly rate can serve as a proxy for that community market rate cannot be allowed to become disconnected from its own analytical underpinnings. A firm's *established* hourly rate for its general range of clients serves the triple purposes of being easily ascertainable (so a court can avoid having to examine extrinsic evidence about the various rates charged by other lawyers with comparable qualifications and experience, *see Laffey*, 746 F.2d at 18–19), predictable (so the parties can more easily calculate what the fee award is likely to be, and reach settlement based on that prediction, *see id.* at 21–22), and, at base, fairly representative of the community's market rate, albeit discounted by the firm's desire to serve particular kinds of clients rather than all comers. On the other hand, a firm that does not even try to accommodate profitability or a particular clientele, and that refuses to price any potential clients out of its services, is a different animal altogether. Such a policy results, as in Galloway's case, in an amalgam of different rates charged to different types of clients. Arbitrarily selecting one of these rates fails to fulfill any of the three purposes for the proxy relationship between individual firm rates and prevailing market rates set out in *Laffey*. First, it is not easy to ascertain *which* of Galloway's many rates is the appropriate one at which to compensate him for work done in this case (the client served here would normally be in the "no-pay-at-all" category, *see* note 5, *supra*). Second, because of this inherent difficulty of determining which rate to apply, the parties could not easily predict a fee award, an uncertainty that would complicate settlement. Third, an ad hoc rate policy based purely on client ability to pay is no evidence at all of the prevailing community rate that the attorney would draw for his services in an open market.[6] In sum, a rigid application of the

**4.** The panel's conclusion that Galloway's "maximum hourly rate is $100," Maj. op., text at 48 n. 2, is unfounded. The $75–$100 range mentioned in Galloway's affidavit is used merely as an example of a rate charged to a particular group. Furthermore, Galloway characterizes it as a "reduced rate." *See infra* n. 5.

**5.** Galloway's affidavit contains only one paragraph that is relevant to determining whether or not he has an established hourly rate:

Because the organizations and individuals I represent do not have sufficient resources to retain experienced counsel at commercial rates, it is my practice to represent them better at no cost or at rates significantly below the commercial rate for work done in the field of coal regulation, whether in health and safety or environmental matters. I determine the level of the reduced rate based on the groups' ability to pay. In many cases, because the group or individual has practically no resources, such as when miners are fired because of alleged safety protests, or the groups have no financial resources and most members are very poor, as is the case with the Council of Southern Mountains, Inc. and Save Our Cumberland Mountains, Inc., I will represent the individual and/or group without fee. For national environmental and conservation groups, my reduced rate currently ranges from $75–$100 per hour.
J.A. at 179–80.

**6.** Consider the following scenario: A merchant is selling rugs in an outdoor market. He posts a sign that advertises his rugs at $100 a piece. He then sells his rugs at that price. Next to him is

*Laffey* presumption to Galloway's situation serves none of *Laffey*'s asserted purposes.

Furthermore, to accommodate *Laffey* with *Blum* —the latter, of course, being the most authoritative interpretation of Congress' intent—we must award statutory fees based on a particular rate of an attorney only if that rate serves as a valid proxy for the prevailing market rate for his services in the relevant community. The panel, by arbitrarily taking one of the many different hourly rates that Galloway charges, based on clients' ability to pay, and designating it as an appropriate measure of his market worth, has deserted not only *Laffey*, but more importantly the hallmark of *Blum, i.e.,* the prevailing market value of an attorney's legal services, were he to go out on the open market. Because Galloway does not have an *established* hourly rate that could serve as any kind of approximation of his market rate, we must look to other and different kinds of evidence to determine what his services are worth.[7] *See* part II, *infra*.

True, the firm in *Laffey* determined its established rate based on its clients' ability to pay. Indeed, *Laffey* includes a long footnote discussing Bredhoff & Kaiser's argument that it charged a lower customary rate because it wanted to represent clients who could only pay a lower rate. 746 F.2d at 14–15 n. 69. *Laffey* concludes, however, that an established rate is, nevertheless, an established rate, regardless of the motives of the firm in setting it. Now, the panel extends that reasoning: Gallo-

way's rates (albeit ad hoc and not established) are still his rates, regardless of his motives in setting them. Since he does charge some of his clients *rates*, we may look to those rates to determine his statutory fee.

Using a pure opportunity cost theory, this argument concludes that Galloway has chosen to practice law for clients who can pay little or no money, and that the cost of his taking a statutory fees case to displace a regular client is no more than his highest fee-paying client. *But opportunity or displacement cost is not the test;* Congress' command, as interpreted in *Blum,* is that *all* attorneys are to be compensated in statutory fees cases at the prevailing market rate in the relevant community. Indeed, under the panel's theory, there would have been no reason to exempt legal service organizations from the opportunity cost test, as *Blum* certainly did.

Most disturbingly, the panel's theory produces strong disincentives to young lawyers trying to make public interest-type practice work. Large, wealthy private firms will receive top dollar in statutory fees compensation for the occasional pro bono case they take. Nonprofit legal services organizations with salaried employees will also receive fees based on the top market rate for lawyers of similar qualifications and experience. But struggling private-public interest attorneys who purposefully charge their poorer clients for services at cut-rates but who must yet depend upon those rates for their livelihood

---

a merchant selling rugs, but with no sign. Instead, when a prospective purchaser arrives, the merchant asks the customer about his financial wherewithal, and then determines a price calibrated to the customer's means. His rugs, similar to the first merchant's, end up selling for a range of prices, between $0 (to the poor sympathetic beggar) and $500 (to the rich oil baron). I think it plain that the first merchant's established price can be said to be the market value of his rugs—at least as a threshold matter, if we are not to permit the first merchant to introduce other evidence—while it would be impossible to value the second merchant's rugs based on the prices at which they are sold.

**7.** Indeed, another District Court has ruled on the identical issue before us involving the same attorneys and another aspect of the same litiga-

tion. *Save Our Cumberland Mountains, Inc. v. Hodel,* 651 F.Supp. 1528, 1540–41 (D.D.C.1986). The court there held that Galloway should not be compensated at the "rate he charges his occasional paying clients," *id.* at 1540, for two reasons. First, "Galloway's rates are well below the market rate charged by his contemporaries in experience and expertise," and thus are "outside the reasonable rate 'bracket' for similar work in the community," *id.,* the grid against which *Laffey* validated established hourly rates. *See* 746 F.2d at 24–25; note 2, *supra*. Second, "Galloway ... runs a two man firm, and does not have a rate schedule. His rate, when he charges one at all, varies based on his client's ability to pay. His is not an 'established' rate within the meaning of *Laffey*." 651 F.Supp. at 1540.

will receive those same cut-rates as statutory fees. Clearly, Congress did not intend such an arbitrary disparity when it enacted provisions allowing reasonable attorneys' fees in order to induce high quality representation from the private bar. Yet, *Laffey* and this panel have brought us to this point of jurisprudential absurdity.

## II.

Under my analysis, we would remand to the District Court to determine the prevailing community market rate for Galloway based on his qualifications and experience in this kind of case. The District Court relied upon the *Laffey* District Court's schedule of prevailing community rates. *Save Our Cumberland Mountains, Inc. v. Hodel*, 622 F.Supp. 1160, 1165 (D.D.C.1985) ("For an attorney with 11 to 19 years of experience, the reasonable rate has been found to be $150."). There are two problems with using this schedule. First, it was compiled under the then-prevailing notion that current rather than historical rates could be used to compensate attorneys who won lawsuits against the government. It has become clear since that absent an explicit waiver of sovereign immunity, attorneys' fees awarded against the federal government must be based on historical rates. *See Library of Congress v. Shaw*, —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Thompson v. Kennickell*, 797 F.2d 1015 (D.C.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987). Thus, while the *Laffey* schedule may be appropriate for hours billed during 1983 (the date of the schedule), it would (at least theoretically) overvalue Galloway's 1981 and 1982 hours and undervalue his 1984 and 1985 hours. Second, Galloway graduated from law school in 1972, J.A. at 174; accordingly, in 1981 and 1982 he was in the *Laffey* 8–10 years out of law school bracket ($125 per hour at 1983 rates), while only in 1983, 1984, and 1985 was he in the *Laffey* 11–19 years out of law school bracket ($150 per hour at 1983 rates).

Petitioners did submit a detailed fee request, including not only the *Laffey* schedule but also affidavits from Washington, D.C. attorneys and a table of rates charged in 1983 by leading area law firms. J.A. at 211–49. It is not clear, however, whether the District Court relied upon any of these other submissions, and it must be noted that most do not contain historical rates.

In the other *Save Our Cumberland Mountains* fee case, *see* note 6, *supra*, the District Court, after finding that Galloway did not have an established hourly rate, determined his prevailing market rate by comparing him with Nancy Crisman, a public interest attorney who also had graduated from law school in 1972 and achieved significant reputation and success in her field. The court had compensated Crisman at $150 per hour for 1983, 1984, and 1985, based on affidavits and (what appears to be) the same table of rates charged in 1983 by leading area law firms as submitted in the case at bar. The court then reduced these rates to $115 per hour for work done in 1981 and $125 per hour for work done in 1982 (although it did not explain how it arrived at the reduced figures). 651 F.Supp. at 1541. Except for the unexplained reduction formula, the District Court's approach in the other *Save Our Cumberland Mountains* fees case appears to be a reasonable one.

I would thus remand the issue of the prevailing market rate for compensation of Galloway for further factual findings. Specifically, I would instruct the District Court to determine the prevailing market rate in Washington, D.C. for lawyers of Galloway's experience and specialized expertise for the years 1981–85. In making its findings, the District Court should examine the affidavits and tables already submitted, and require further documentation if necessary to provide evidence of historical rates.

## III.

The prevailing community market rate that *Blum* mandates is not just *any* ad hoc rate that an attorney charges to *any* paying client, no matter how it is calculated,

even if it is his top ad hoc rate.[8] *Blum* explicitly holds that Congress did not intend statutory fees to vary depending upon the clients a lawyer serves. Thus, someone who typically represents environmentalists is entitled to the same fees as one who represents industry in the same cases, other qualifications being equal. Yet, today this court, harking to the siren song of *Laffey,* distances itself even further from that congressional intent, establishing a level of statutory compensation that depends solely upon the level of pay the attorney asks from his clients. The highest paid law firm in town whose pro bono work amounts to less than 5% of its billable hours will henceforth receive five times the fee for the same case as the idealistic lawyer who devotes 95% of his practice to nonpaying or low paying clients. If this is what *Laffey* has wrought, it is time that we or Congress took a harder look.

I dissent from part II.B.

---

**8.** I fear the concurrence totally misses the point of my analysis in suggesting it "end run[s]" *Laffey.* Conc. op. at 55. *Laffey* applies only to an established rate and Galloway has none. *See, supra,* at 5. He charges only what each client can pay. In the case of national environmental organizations the "pay what you can" range runs from $75 to $100. That is still, according to his affidavit, a "reduced" rate based on the client's ability to pay and is not an "established" rate at all.